**UNITED STATES of America,
Appellant,**

v.

**Joanne Mae SCHULTETUS, a Widow, Individually and as next friend of Douglas Jay Schultetus, a minor, et al., Appellees.**

**UNITED STATES of America,
Appellant,**

v.

**AERO ENTERPRISES, INC., et al.,
Appellees.**

**Nos. 17712, 17713.**

United States Court of Appeals
Fifth Circuit.

April 18, 1960.

Rehearing Denied May 17, 1960.

Howard E. Shapiro, Morton Hollander, Attys., Dept. of Justice, Washington, D. C., A. W. Christian, Clayton L. Bray, Asst. U. S. Attys., Fort Worth, Tex., W. B. West, III, U. S. Atty., Fort Worth, Tex., George Cochran Doub, Asst. Atty. Gen., for appellant.

L. W. Anderson, William B. Henley, Jr., Dallas, Tex., for appellees Joanne Mae Schultetus and American Flyers, Inc. Harris, Anderson, Henley & Rhodes, Dallas, Tex., of counsel.

S. A. Crowley, Robert D. Maddox, Stanford Harrell, Crowley, Wright, Miller & Garrett, McDonald, Sanders, Nichols, Wynn & Ginsburg, Fort Worth, Tex., for appellees Aero Enterprises, Inc., and Delores Senn.

Before HUTCHESON, JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

These cases arose out of a collision of airplanes over Meacham Field at Fort Worth, Texas. This field is owned and operated by the City of Fort Worth. It is used by all types of aircraft for various purposes but it is not generally used by commercial airlines operating on scheduled flights. There are three large runways on the field, of which only two require reference. Runway 17 runs in a north-south direction (178° South), and it is crossed by Runway 13 which runs in a northwest-southeast direction (130° Southeast). Flight operations at the field were directed from a control tower operated by employees of the Civil Aeronautics Administration, an agency of the United States, herein called C A A. The collision occurred a few minutes after noon on April 9, 1957. The sun was shining and a moderate wind was blowing from the southeast. The two aircraft involved in the collision were owned by separate flying schools. One of these aircraft, a Cessna 170, frequently identified in the testimony as 59 Victor, was owned by American Flyers, Inc. It was in charge of instructor pilot Schultetus who had with him student pilot Rattunde. The other plane was a Cessna 140 which was owned by Aero Enterprises, Inc., and at the time of the collision it was operated by instructor pilot John Louie Senn and student pilot C. P. Chambers. All four occupants of the aircraft were killed in the collision.

Aero Enterprises, Senn's widow for herself and her minor children, and Senn's mother, brought suit against American Flyers and the United States. It was asserted that the pilots of the Cessna 170 were negligent in operating

the plane and that the United States was negligent in the giving of improper signals and in failing to give proper signals from the control tower, and that the negligence so alleged was the cause of the collision. American Flyers cross-claimed against Aero Enterprises and the United States for the value of its Cessna 170, making similar allegations of negligence against Aero Enterprises as the plaintiffs had made against it, and making like charges against the United States. American Flyers also cross-claimed against the United States for indemnity, and the United States cross-claimed against American Flyers for indemnity or contribution. The widow of Schultetus for herself and her minor child brought suit against Aero Enterprises and the United States asserting negligence liability for the death of her husband. Aero Enterprises cross-claimed against the United States which cross-claimed against Aero Enterprises, each making protective claims for indemnity or contribution. The Ohio Casualty Insurance Company intervened to recover workmen's compensation benefits paid for the death of Schultetus.

The two cases were consolidated for trial. The district court found that there was no negligence in the operation of either of the aircraft. It found that the C A A employees were negligent in what they did and in what they failed to do, and that their negligence was the cause of the collision with the resulting loss of life and property. Judgments aggregating $147,000 were entered against the United States. The district court's opinion is reported in 167 F.Supp. 239. The United States has appealed in each case and the appeals were consolidated. These proceedings do not involve any claims from the death of either of the student pilots.

Shortly before the collision the Cessna 140 took off on Runway 13 to the southeast and into the wind. This plane was engaged in making practice landings. This plane was radio equipped but the radio was not in operation. No radio was required in the activity of the Cessna 140. The routine of such procedure was to climb from the take-off to a 400-foot altitude, make a left turn to the crosswind leg and climb to 600 feet, turn left again to a downwind course parallel with Runway 13 for an appropriate distance, then make another left turn into the so-called base leg and from it turn into the runway approach for a landing. Two other Cessna 140's took off after the Senn-piloted aircraft. One of these had aboard instructor pilot George A. Schlarman and student pilot Marvin Brown. The other Cessna 140 was being flown by Pete B. Dennis.

The Cessna 170 was coming in from the north to make a simulated instrument landing on Runway 17. Rattunde, the student, was taking instruction instrument flying. His side of the windshield was covered with a transparent amber shield and his eyes were covered with polaroid goggles, so that he could see the instrument panel in the plane but could not see through the windshield. The visibility of his instructor was not, and was not permitted to be, restricted or impaired. As the Cessna 170 approached, the Cessna 140 had turned into its northwest or downwind course, flying at 600 feet. The Cessna 170 requested the control tower to clear it for a simulated instrument landing. The clearance was given and with the clearance a warning was given that there was "Traffic, Cessna 140 East of the field, downwind for Runway 13." A brief interval later the tower again warned the Cessna 170 of "Traffic, Cessna 140 downwind East of the field for Runway 13," and asked "Do you have him in sight?" The Cessna 170 replied, "I have him in sight." As the Cessna 170 came over the "middle marker" radio facility, about six-tenths of a mile from the end of Runway 17, at an altitude of 400 feet, it transmitted "missed approach," and began climbing. The tower gave another warning, "Cessna crossing in front of you." Calvin Ellis, the Senior Controller at the tower, heard an acknowledgment. As the Cessna 170 began its climb it made a turn

to the left [1] and in a matter of seconds the Cessna 170 came up to and struck the Cessna 140.

The district court found that each of the aircraft was on a proper course and altitude at the time of the collision and that there was no negligence on the part of the operator of either of the aircraft. It was found that there were two or more Cessna 140's on the downwind leg and that the tower operators were negligent in failing to warn the Cessna 170 of the presence of more than one and in failing, in the warnings, to identify the Cessna 140 referred to. The district court found that the operators of the control tower negligently failed to instruct the Cessna 170 to alter its course so as to avoid the collision, and likewise negligently failed to give red light signals to the Cessna 140 directing it to give way to the Cessna 170. It was also held that the tower operators negligently failed to maintain proper control over the two aircraft so that each would be properly spaced. The acts of the operators of the control tower, so found to be negligent, were determined by the district court to be the proximate cause of the collision and of all the damage resulting therefrom. 167 F.Supp. 239, 245–246. The findings and conclusions of the district court are challenged by the United States.

 Liability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care. King v. United States, 5 Cir., 1949, 178 F.2d 320; 6 Am.Jur. 38 et seq., Aviation § 64. The applicable law, under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), is that of Texas. The well-settled negligence rule in Texas is that "The ability to have foreseen and prevented the harm is determinative of responsibility." 30B Tex.Jur. 179, Negligence, § 8. But, as this Court has said, " * * * it is not required that the particular accident complained of should

have been foreseen. All that is required is 'that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.' " International Derrick & Equipment Co. v. Croix, 5 Cir., 1957, 241 F.2d 216, 221, certiorari denied 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428.

It is the position of the United States that the district court committed error in determining that the acts of the operators of the control tower were negligent, and the proximate cause of the collision and of the damage resulting from it. The Government contends that the court was in error in determining that the Cessna 170 was not negligent in making the left turn that brought it into collision with the Cessna 140.

It is required that, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses," Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A. This Court, discussing Rule 52(a) has said,

"Under that rule, as it plainly reads and has been interpreted by the courts, it is not for the appellate court to substitute its judgment on disputed issues of fact for that of the trial court where there is substantial credible evidence to support the finding. It may reverse, though, under the rule (1) where the findings are without substantial evidence to support them; (2) where the court misapprehended the effect of the evidence; and (3) if, though there is evidence which if credible would be substantial, the force and effect of the testimony considered as a whole convinces that the finding is so against the great preponderance

---

[1.] The making of a turn by the Cessna 170 is in dispute. The district court found that such a turn was made. The evi-

dence permits, if it does not require, such finding.

of the credible testimony that it does not reflect or represent the truth and right of the case." Sanders v. Leech, 5 Cir., 1946, 158 F.2d 486, 487. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; Williams v. United States, 5 Cir., 1958, 252 F.2d 887; Manufacturers Casualty Ins. Co. v. Intrusion-Prepakt, Inc., 5 Cir., 1959, 264 F.2d 758; Neil v. Commissioner of Internal Revenue, 5 Cir., 1959, 269 F.2d 563.

■ The Government attacks the district court's findings that there were two or more Cessna 140's on the downwind leg for Runway 13; and that the control tower negligently failed to warn the Cessna 170 of the presence of more than one and failed to indicate which of the Cessna 140's was referred to in the warnings. Of the two Cessna 140's which followed the one involved in the collision, the first to take off was in charge of pilot Schlarman who was giving instructions to student pilot Brown. This plane flew an extended course on taking off. It had, perhaps, completed its crosswind leg and started downwind before the collision and even before the warnings. The confusing and conflicting evidence would support such finding as was made. But, having flown the extended take-off leg this plane was not far enough along on the downwind leg to have been the plane to which the Cessna 170 referred in acknowledging the control tower's final warning of "Cessna crossing in front of you."

The last of the Cessna 140's to take off from Runway 13 was piloted by Dennis who was practicing solo flying. He was some distance behind Schlarman and, by his testimony, had just rolled into the downwind leg when the collision occurred. There is nothing in the evidence that justifies the inference that the operators of the Cessna 170 could have regarded it as the Cessna 140 which it acknowledged that it had in sight. Although there were witnesses who voiced the opinion that the operators of the Cessna 170 might have believed that the warnings from the control tower referred to the Schlarman or Dennis aircraft, such opinions could only have been based on speculation and conjecture. We cannot escape the deduction that the only well-founded determination of which the facts will admit, is that both the operators of the tower and the operators of the Cessna 170 had reference to the Cessna 140 which was in the collision, in the giving by the one and the acknowledging by the other of the warnings. The district court's findings, then, we find to be clearly erroneous.

It seems apparent that the district court had an erroneous concept of the functions and duties of the operators of the control tower. This is manifested in its findings, so called, that the operator at the control tower was negligent in failing to instruct the Cessna 170 to alter its course so as to avoid the possibility of collision with aircraft in the traffic pattern of Runway 13. The duties and responsibilities of air traffic control personnel have been set forth in a joint manual called the A N C Manual, issued by the Army, Navy, Air Force, Coast Guard and C A A. The control tower is charged with the responsibility "for the issuance of clearances and information to pilots of aircraft for the purpose of preventing collision between: * * * Aircraft in the traffic pattern, and landing and taking off at the landing area." A N C Manual, Rev.2d Ed., p. 29, § 3.000. So too it is provided that, "When flying in visual flight rule weather conditions it is considered the direct responsibility of the pilot to avoid collision with other aircraft. Under such conditions, the information and clearances issued by the control tower are intended to aid pilots to the fullest extent in avoiding collisions." Id. § 3.010. The Civil Air Regulations of the Civil Aeronautics Board provide that "The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft." 14 C.F.R. § 60.2. The airport traffic control procedures have been thus summarized,

"All aeronautical activities at any airport, or landing area, and all flying of aircraft departing from or arriving at an airport which constitutes a control area or control zone, must be conducted in conformity with the current pertinent provisions of the Civil Air Regulations.

\* \* \* \* \* \*

"When flying in visual flight rule weather conditions, (regardless of the type flight plan or air traffic clearance), it is the direct responsibility of the pilot to avoid collision with other aircraft. Under such conditions, the information and clearances issued by the control tower are intended to aid pilots to the fullest extent in avoiding collisions. In this connection a clearance issued by a tower (such as 'cleared to land') either by radio or visual signal is permissive in nature and does not relieve the pilot from exercising a reasonable degree of caution in executing the provisions of the clearance. However, such clearances will not be issued unless, in the opinion of the tower, the anticipated action can be safely completed from a collision hazard standpoint if reasonable caution is exercised by the pilot." Speizer, Preparation Manual for Aviation Negligence Cases 397.

The information given by radio from the tower to the Cessna 170, as to the presence of the Cessna 140, culminating in the warning, "Traffic, Cessna crossing in front of you," was in full discharge of the responsibility of the tower to give information for preventing collision between aircraft. The theory followed by the district court would place upon the operators of control towers the primary responsibility for the operation of aircraft at the field. Governmental regulations, having the force of law,[2] have assigned this responsibility to the operators of aircraft.

What we have just said applies with no inconsiderable force to the so-called findings of the district court that the tower operator negligently failed to give visual light signals to the Cessna 140. A steady red light signal means, "Give way to other aircraft and continue circling." An alternating red and green light signal is a "General Warning Signal" meaning "Exercise Extreme Caution." The district court decided that the tower should have given the Cessna 140 the steady red "give way" signal after the Cessna 170 had been cleared for a simulated instrument approach. At this time and thereafter those in the tower, by their radio contacts with the Cessna 170, believed and were entitled to believe that if the Cessna 140 maintained its course, which it did, the Cessna 170 would avoid it. The tower operator, at this time, was not confronted with a situation which imposed a duty to attempt to warn the Cessna 140 by a signal light.

The district court also reached the determination that the tower should have given the Cessna 140 a general warning signal to warn it of the presence of the Cessna 170 after the tower operator had observed the aircraft were on a converging or collision course. It might be noted at this point that by the time there might have been any thought of using a general warning signal light, the Cessna 140 had passed the tower and those in it would have had to look backward to have seen any signal. The Cessna 140 was doing routine training flying and it is not suggested that there were any reasons other than the normal hazards of flying for the Cessna 140 to anticipate that it would be signaled. The tower operator, to be sure, could have hoped and perhaps expected that such a signal then given would be seen. He could also have hoped but perhaps not have expected that a general warning then given would have alerted the Cessna to the danger then present or then

---

**2.** 49 U.S.C.A. §§ 551, 560(a) (5), 1421, 1430(a) (5); Allegheny Airlines v. Vil-

lage of Cedarhurst, 2 Cir., 1956, 238 F. 2d 812.

developing and avoided the collision. The tower operator believed and was entitled to believe that the Cessna 170 saw the Cessna 140 crossing in front of it and that it would keep clear. The tower operator was entitled to believe that the operator of the Cessna 170 would, in the exercise of his direct and primary responsibility, avoid a collision with another plane, the presence of which he had acknowledged. There was no actionable negligence on the part of the tower operator in failing to give, or in attempting to give, visual light signals to the Cessna 140. The determination to the contrary by the district court is, we think, clearly erroneous.

What we have said also disposes of the so-called finding that the tower operators negligently failed to maintain control over the two aircraft so that each would be properly spaced so as to avoid collision. Here again the district court has overlooked the principle that the direct and primary responsibility for the operation of aircraft over or in the vicinity of an airport rests upon the pilots of the aircraft. We are of the belief that in this respect also the district court was in error.

It may be that there is a greater duty and responsibility upon the control tower to aircraft operating under instrument flight rules[3] than under visual flight rules, and in such a situation a lesser responsibility rests upon the pilot.[4] Although flying a simulated approach the Cessna 170 was operating under visual flight rules. As has been said, ability of the instructor pilot to see was not impaired. Whatever may be the duty of the tower to a plane operating under instrument flight rules, we have no doubt but that the duty of the tower to the two aircraft involved in the collision and to those flying in them was fully discharged. We do not say that cases may not arise where the United State will be liable by reason of negligence of control tower operators for damages arising from the collision of aircraft. We are convinced that this is not such a case. Those findings of the district court which we decide are clearly erroneous, were either without substantial evidentiary support or based upon misapprehensions of the effect of the evidence.

The United States urges with much vigor that the operators of the Cessna 170 were negligent in failing to maintain a proper course that would have kept it out of the course of the Cessna 140, and in failing to heed the warnings given from the tower. Having reached the conclusion that the Government must prevail on its appeal because no actionable negligence attributable to it has been shown, it becomes unnecessary for us to consider questions as to the negligent operation of the Cessna 170.

The judgments of the district court are reversed and judgments are here rendered for the United States, and the cause is remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

3. "An airport traffic control tower is responsible for the insurance of clearances and information to pilots of aircraft for the purpose of preventing collision between:

 ✻ ✻ ✻ ✻ ✻

"Aircraft operating under instrument flight rules after control of such aircraft has been delegated to the tower by the appropriate air route traffic control center." A N C Manual, Rev. 2d Ed. p. 29, § 3.000.

4. "When flying in instrument flight rules weather conditions it is obviously impossible for the pilot to assume the responsibility of avoiding collision with other aircraft except as directed by the ground control agency. Therefore, it is of the utmost importance that all clearances issued by a control tower to pilots of aircraft under its jurisdiction be adequate, concise and definite inasmuch as the pilot has no other means of ascertaining the proximity of other aircraft." A N C Manual, Rev. 2d Ed. p. 29, § 3.011.