Carl J. HOCHREIN, Adm'r of the Estate of Richard C. Hochrein,

v.

UNITED STATES of America, Robert T. Wilson and Civil Air Patrol.

Civ. A. No. 27906.

United States District Court
E. D. Pennsylvania.

Feb. 3, 1965.

Alfred L. Wolf, Bernard M. Borish, Steven A. Arbittier, Anthony S. Minisi, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Alfred M. Nittle, Bangor, Pa., for plaintiff.

Drew J. T. O'Keefe, U. S. Atty., Sidney Salkin, Asst. U. S. Atty., Philadelphia, Pa., Michael R. Wherry, John G. Baker, Civil Division Dept. of Justice, George H. Foster, Jr., James Lampl, Federal Aviation Agency, Washington, D. C., for the United States.

Peter P. Liebert, 3rd, Liebert, Harvey, Herting & Short, Philadelphia, Pa., for Civil Air Patrol and Robert T. Wilson.

DAVIS, District Judge.

This action was commenced by the plaintiff against the several defendants jointly for damages resulting from a mid-air collision between two private airplanes attempting to land at the North Philadelphia Airport. Robert T. Wilson and Richard C. Hochrein were the pilots of the private planes and the airport tower was under the jurisdiction of the Federal Aviation Agency, manned by air traffic controllers in the employ of the Government. Shortly before trial, plaintiff executed a joint tortfeasor release with the defendants, Robert T. Wilson and the Civil Air Patrol. The trial proceeded non-jury against the United States as provided in the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2402. This opinion, therefore, will deal only with the claim of negligence alleged against the United States.

*LIABILITY*

The decedent, Richard C. Hochrein, was alone in his Cessna 140 Aircraft flying on September 30, 1959 from the Blairstown, New Jersey Airport to the North Philadelphia Airport. At 2:15 P.M., EST., Hochrein radioed the North Philadelphia Tower and was instructed by the tower, through Frank W. Toon, Jr. the air traffic controller in charge, to enter the traffic pattern for runway 15 on the downwind leg. Upon entering the pattern Hochrein again radioed the tower and after Toon had sighted Hochrein in the pattern, Toon acknowledged his transmission and cleared him to land on runway 15.

Almost immediately thereafter, Toon sighted a non-radio equipped Aeronca aircraft flying the same pattern as the Cessna, but behind, above and outside the Cessna, on the downwind leg. This plane was piloted by defendant Wilson and had been making practice "touch and go" landings on runway 15 shortly before the sighting by Toon mentioned above. The Aeronca was based at the North Philadelphia Airport, known to Toon, and visually identified by Toon and the other traffic controller on watch in the tower, Raymond Kevles.

Toon used the portable light gun to signal the Aeronca to exercise caution. The light gun is used to control non-radio equipped aircraft in visual flight rule conditions which existed at all times pertinent to this action.

This light signal was not acknowledged by the Aeronca.[1] However, the Cessna was in clear sight and should have been seen by Wilson in the Aeronca. The signal given the Aeronca by Toon on the downwind leg was a sufficient precaution for the situation as it then existed.

■ As the planes turned onto the base leg, first the Cessna then the Aeronca, Toon again signalled Wilson in the Aeronca to exercise caution due to his traffic, i. e. the Cessna ahead of him. At this point in the pattern, this signal given by Toon was sufficient to discharge his duty to supervise and control the traffic within the area of his jurisdiction in light of the weather conditions and visual flight rule then in effect. But Wilson in the Aeronca again failed to acknowledge Toon's signal. To this point, Toon was justified in presuming that Wilson could see, and was aware of, the traffic ahead of him. The Cessna was in clear sight and it is a pilot's duty to keep watch and avoid other aircraft.[2] But it is also a pilot's duty while in a control zone to be attentive to signals emanating from the control tower. After Wilson in the Aeronca failed to acknowledge his first two signals, Toon should have been aware of the possibility that Wilson not only did

1. A non-radio aircraft normally acknowledges a control signal by rocking its wings.

2. See Civil Air Regulations 60.2, 60.12(c), 60.15, 60.30; 14 C.F.R. 60. See also: Civil Air Regulations 60.14(e) requiring the trailing aircraft to yield right-of-way to preceding aircraft which is landing.

not see the light signals, but did not see the Cessna as well. Though this would mean that Wilson violated several air regulations and was negligent, this conduct up to this point was a clear warning that Wilson might continue in his lack of due care.

■ A person can not be held liable for another's negligence, but the second party's negligence can arise from a duty imposed as a result of the original negligence. If Wilson was negligent, and we consider he was, the question of the defendant United States' liability rests on whether or not Toon had a duty to take some action to warn Hochrein in the Cessna of the Aeronca's presence.

■ An air traffic controller's duty to aircraft in his control zone is contained in the Air Traffic Control Rules (14 C.F. R. 617) and the ANC Manual.[3] These rules and regulations have the force and effect of law.[4] The regulations outline Toon's duty as air traffic controller and in effect require a controller to aid and assist the pilots of aircraft within the control zone. This assistance takes a variety of forms including the issuing of clearances and disseminating information regarding traffic in the pattern and control area.

■ We agree that the main responsibility for the safe conduct of an aircraft in the control zone under visual flight rule conditions rests with the pilot of each aircraft. We also agree that the controller may be analogized to a traffic officer at an intersection. In this factual situation as it developed, pilot Hochrein was responsible for the safety of his aircraft and, after receiving his clearance to land,[5] remained primarily responsible for the movement of his aircraft. Decedent Hochrein was required to follow his clearance, not blindly, but correlative with

his duty to exercise care for his own safety from everything of which he was aware. There is nothing in the record which would indicate to this Court, and we so find, that Hochrein was aware of the Aeronca in the pattern for runway 15 nor that he should have been aware of the Aeronca's presence. If a traffic officer signals a car to proceed through an intersection knowing that the driver can not see an approaching vehicle, which the officer knows has just passed through two other signals to stop, would it not be incumbent upon the officer to at least warn the driver of the other's presence? We think it should.

■ Controller Toon failed in his obligation to pass on information which may be necessary for a pilot to discharge his responsibility for his own safety. When Wilson failed to acknowledge Toon's cautionary signals, a duty [6] arose to at least inform Hochrein of the Aeronca's presence so that Hochrein would be aware of a possible danger to his landing and take it into consideration in following the "mandatory" [7] clearance or deciding that an emergency exists and thereby forego landing. Toon was negligent in this respect and this negligence was a cause of the ensuing collision and death of pilot Hochrein.

After the Aeronca failed to acknowledge both signals, controller Toon signalled Wilson to "give way to other aircraft and circle around" by directing a steady red light at the Aeronca from mid-point on base until the Aeronca had begun a steep descent and turned on to final approach, a period of about thirty seconds. Toon knew the Cessna was going to land and that the Aeronca's pilot probably had not seen the Cessna. Toon was watching the Aeronca carefully and giving Wilson the correct signal under

---

3. See Government's exhibit 12 and plaintiff's exhibit 19, respectively.

4. United States v. Schultetus, 277 F.2d 322, 86 A.L.R.2d 375 (5th Cir. 1960).

5. The argument which developed at trial, that a clearance is mandatory, not merely permissive, was a question of semantics which this Court feels is disposed of by its finding.

6. This duty is spelled out in the ANC Manual. See ANC 3.000(3), 3.400, 3.500; and 3.501.

7. See footnote 5.

the circumstances. But should not Toon have also given Hochrein the benefit of the controller's information so that he too could appraise the situation as it developed and attempt to keep a watchful eye on the Aeronca's movements? We think Toon should have apprised Hochrein of the presence of an aircraft in his pattern which seemingly disregarded all signals from the controller. The continuing failure to so inform Hochrein of the existence of a possible danger, in the form of an unseeing aircraft, was a continuing breach of duty owing to Hochrein which contributed to the cause of the collision and pilot Hochrein's death.

## DAMAGES

We turn now to the issue of damages. This action was brought under the Pennsylvania Wrongful Death Act, 12 P.S. §§ 1601–1604, and the Survival Act, 20 P.S. § 320.601, for loss accruing to Hochrein's family as a result of his death and the decedent's own loss which accrues to his estate.

At the time of his death, Hochrein's family included his wife and three small children, ages 11, 8 and 5. Mrs. Hochrein testified that her husband contributed $80.00 per week to the family for its support immediately prior to his death. This is uncontradicted and, in light of his earnings to date,[8] will be accepted by this Court as the loss to his family, in equal shares. Therefore from the date of the accident to the present, the family has a total loss of $20,800.00. The children could expect contribution for their maintenance until they reached majority. Therefore, the Court finds their future loss, reduced to present worth to be

Richard (6 years until 21)...$5,113.68
David (9 years until 21)....$7,074.08
Cynthia (12 years until 21)..$8,719.36

Mr. Hochrein had a life expectancy at the time of his death of 40 years. There-fore, his wife, Phyllis, could expect future contribution for 35 years, reduced to present worth, amounting to $15,077.-92. Also recoverable under the Wrongful Death Act is a reasonable funeral expense. In this case, the cost was $881.50 which is certainly reasonable.

The loss to the decedent's estate can best be calculated by taking a reasonable figure as his average gross earnings for the rest of his working life which was thirty-three years.[9] Here the basis of recovery is the pecuniary loss to the estate and it is reasonable to assume that the decedent would have worked as long as the average man, but probably much more productively.

There is ample basis in the record for a finding that Hochrein was an exemplary worker for his employer, Spider Staging Sales Company, and anxious to get ahead. His tax returns [10] reflect an almost steady increase in salary and/or commissions and the testimony of his former superior and fellow workers indicate that this accession to higher earnings would have continued. We cannot accept however, as being entirely too speculative, Mr. Adams' [11] opinion that Hochrein would have been earning $40,000.00 per year by 1963 and continue at that rate for the rest of his life. The two cases relied on by the plaintiff to support this extremely high earning figure, Smail v. Flock, 407 Pa. 148, 180 A.2d 59 (1962), and Mc-Cullough v. Holland Furnace Co., 293 Pa. 45, 141 A. 631 (1928) are both inapposite on their facts. In the former, the decedent kept no financial records so evidence was allowed to establish his past earning record. In the latter, the decedent's services had a definite market value and therefore an opinion was allowed as to that market value at the time of trial to serve as a basis for future losses.

There was testimony that Hochrein's replacement as Spider's New York salesman earned $19,800.00 in 1960. We will

---

8. For Hochrein's gross earnings for the years 1956–59, see Government's exhibits 13–16.

9. See Government Exhibit 17.

10. See Footnote 8.

11. This witness replaced Hochrein as Spider's Philadelphia salesman.

accept this as a reasonable figure for Hochrein's gross earning over his work life expectancy. Though there could very well have been more lucrative years, there would probably be lean ones as well. The commissions earned by salesmen in any line of endeavor are subject to many fluctuations completely out of their control. However, as an average gross earnings figure, it is reasonable.

From his gross earnings, we must deduct the cost of maintaining himself and his business expenses. In this regard, due consideration is given to the fact that Hochrein was maintaining his home in Portland, Pennsylvania and required to also maintain an apartment in New York City. It is also true that Hochrein had the added expense of travelling between these residences. His tax returns reflect expenses incurred which were not reimbursed by the Company. Therefore, it is reasonable to expect that Hochrein would have spent $9,800.00 on his maintenance and expenses.[12]

■ Hochrein's estate is entitled to $50,000.00 for earnings lost to date and $134,061.00 for future earnings during his work life expectancy,[13] reduced to present worth. The total of $184,061.00 must be reduced by the recovery of $56,785.00 in the Wrongful Death action.[14] Therefore, the Survival Act damages amount to $127,276.00.

The plaintiff is also entitled to recover for the loss of the Cessna aircraft the value of which was stipulated at trial to be $2,000.00.

Damages may be summarized as follows:

Survival Action damages..$127,276.00
Wrongful Death damages..$ 57,666.50
Property damage.........$  2,000.00
                        $186,942.50

■ The total recoverable damages must be reduced to one-half (½) as a result of the joint tortfeasor release executed by the plaintiff and mentioned in the beginning of this opinion. 12 P.S. §§ 2085, 2089.

The foregoing shall constitute findings of fact. All requests for findings of fact inconsistent with this opinion are rejected and, except as modified by this opinion, we accept the following requests for findings of fact: Plaintiffs' requests Numbers 1–6, 8–16, 19, 25–29, 31–36, and 41; Defendant United States' requests Numbers 1–35, 37–39, 41–42, 45–47, 49–52, 60–62, 67 and 69.

On the basis of the foregoing findings of fact, this Court makes the following

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter.

2. The defendant United States is liable for damages resulting from the negligence of an employee of the Federal Aviation Agency acting within the scope of his employment.

3. There is sufficient basis in the record to establish a finding of fact that Air Traffic Controller Toon was negligent while acting within the scope of his employment.

4. There is insufficient evidence in the record to base a finding of contributory

---

12. In view of the finding that Hochrein would have averaged $19,800.00 per year, it is probable that he would have spent more on his family than $80.00 per week. However, the damages are divided between the Wrongful Death and Survival actions and this minimal amount for family support enlarges the Survival Act recovery. See Pezzulli v. D'Ambrosia, 344 Pa. 643, 26 A.2d 659 (1942).

13. See footnote 9.

14. The item of funeral expenses recoverable under the Wrongful Death Act is not includable in this figure for deduction from the Survival Act recovery. See First National Bank of Meadville, Pa. v. Niagara Therapy Mfg. Corp., 229 F.Supp. 460, (W.D.Pa.1964).

negligence on the part of Richard C. Hochrein and therefore conclude that the record supports a finding of no contributory negligence.

5. There is sufficient basis in the record to support a finding that the death of Richard C. Hochrein and the destruction of the Cessna was the result of Air Traffic Controller Toon's negligence.

6. There is sufficient basis in the record to support a finding that as a result of the death of Richard C. Hochrein and the destruction of the Cessna aircraft plaintiff suffered damages in the amount of $186,942.50.

7. As a result of the Joint Tortfeasor Release executed by plaintiff and 12 P.S. §§ 2085, 2089, plaintiffs' recoverable damages are reduced by one-half (½) to $93,471.25.