Joan S. ROSS, as Administratrix of the Estate of David N. Shefler, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Betty B. ROSEN, as Administratrix of the Estate of Robert L. Rosen, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 5376, 5377.

United States District Court, D. Vermont.

Oct. 6, 1972.

[black box]

[black box]

Coffrin, Pierson & Affolter, Burlington, Vt., for plaintiff Ross.

Wick, Dinse & Allen, Burlington, Vt., for plaintiff Rosen.

George W. F. Cook, U. S. Atty., Rutland, Vt., for defendant.

*Findings, Conclusions and Order*

HOLDEN, Chief Judge.

These two actions present common issues of fact and law brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. The plaintiffs seek damages under the Vermont wrongful death act, 14 V.S.A. § 1492(b), alleging negligent and careless operation of a federal aviation facility, causing the crash of a private plane and contemporaneous death of its occupants.

The actions were consolidated for trial. The evidence was concluded on November 3, 1971, before the late Chief Judge Bernard J. Leddy, at which time decision was reserved. At the time of Judge Leddy's death on January 9, 1972, findings of fact and conclusions of law had not been filed. The request of the United States that the cause be heard on the evidence and record presented before Judge Leddy was consented to by the plaintiffs in both actions. An interlocutory order was entered accordingly and the cause set for hearing on further evidence which any or all parties might offer. No testimonial evidence was offered by any of the parties. The court did conduct a view of the approach control room and tower at the Burlington International Airport. At this time a demonstration flight over the course, which the plaintiffs contend was flown by 89 Yankee, was made and viewed by the court on the radar scope. The demonstration was conducted in the presence of counsel on September 8, 1972, whereupon the case was submitted for decision.

Findings of Fact

1. Plaintiff, Betty Rosen, the widow of Robert L. Rosen, deceased, is a resident and citizen of Montreal, Quebec. Plaintiff Rosen is the duly appointed administratrix of the Estate of Robert L. Rosen. Plaintiff, Joan S. Ross, administratrix of the Estate of David N. Shefler, deceased, is a domiciliary and citizen of the State of New York. Plaintiff Ross and decedent Shefler were divorced in California in 1964.

2. Decedents Rosen and Shefler were both licensed pilots. Rosen had 580 flight hours; Shefler approximately 1,400. Both were certified for piloting twin engine aircraft under either instrument or visual conditions.

3. On the evening of October 6, 1966, plaintiffs' decedents, accompanied by a third passenger, departed Montreal, Canada, for Burlington, Vermont, in a Piper PA–30 Twin Commanche bearing the identification number N7289Y (89 Yankee). This aircraft was owned by Executive Instruments, Inc., a Vermont corporation with offices in Burlington, Vermont. Decedents were stockholders and officers of this corporation. The purpose of decedents' trip was to practice simulated instrument landings at Burlington International Airport.

4. 89 Yankee landed at Newport, Vermont, at approximately 0000 GMT (8:00 P.M. E.D.T.) to clear United States Customs and Immigration Inspection. At the time of clearing customs, decedent Rosen declared himself to be the pilot in command of the aircraft, to the Customs Officer and on the official customs form. Both decedents were familiar with the Burlington area and had frequented the airport for instrument practice exercise. 89 Yankee left Newport at approximately 0018 GMT (8:18 P.M. E.D.T.) for Burlington, a distance of approximately 47 nautical miles. The air safety investigator for the Civil Aeronautics Board was unable to locate any record that a flight plan had been filed or that there had been weather briefings at Newport.

5. At 0023 GMT (8:23 P.M. E.D.T.) 89 Yankee tried three times to radio its identification number to approach control in Burlington. Approach Control is staffed by Air Traffic Controllers employed by the Federal Aviation Agency (FAA) and is located in the terminal building of the Burlington International Airport. All three transmissions from 89 Yankee were weak. At 0025 GMT (8:25 P.M. E.D.T.), 89 Yankee again called Burlington Approach Control and the transmission was acknowledged.

6. At 0026 GMT (8:26 P.M. E.D.T.) 89 Yankee told Burlington Approach Control it was flying Visual Flight Rules (VFR) at 4000 feet altitude with visual meteorological conditions and requested a "missed approach procedure." This is a procedure by which pilots practice landing under simulated instrument conditions, although weather and visibility permit landing by visual reference. VFR means that the pilot controls the aircraft by his visual observation and provides his own separation from other aircraft, obstructions and terrain. On October 6, 1966, weather conditions between 8:00 P.M. E.D.T. and 9:00 P.M. E.D.T. were clear and dark, with thirty miles forward visibility. At 4000 feet the wind was from the west at approximately 31 miles per hour. 89 Yankee was instructed to stand by. "Stand by" means the controller is temporarily busy, —that he will get back to the aircraft when he can.

7. At 0033 GMT (8:33 P.M. E.D.T.), 89 Yankee informed Burlington Approach Control that it was standing by. At 0035 GMT (8:35 P.M. E.D.T.) 89 Yankee repeated it was standing by and was told to repeat its identification number. At that point (X–1) 89 Yankee gave its position as on the "060 Burlington crossing the 133 of Plattsburgh." The positions X–1, X–2 and X–3 are shown on the navagational chart, plaintiffs' Ex. 15, which is incorporated and made a part of these findings. The aircraft again requested a "missed approach procedure" under ILS.[1] This information provides the position and heading of the aircraft which is determined in the aircraft by the reception of a radio signal on a specific bearing (radial). This first position is approximately fifteen nautical miles northeast of the airport. 89 Yankee was told its transmission was garbled and should again stand by.

8. At 0036–0037 GMT (8:36–37 P.M. E.D.T.) 89 Yankee was asked to repeat its request. The aircraft then stated it was flying VFR at 4000 feet "on the Burlington 060 crossing the Plattsburgh 138" (X–2) and again requested a missed approach practice procedure under ILS. This position is approximately 12 nautical miles northeast of the airport. Approach Control advised 89 Yankee to contact Burlington Tower for approval when ten miles away. Burlington Tower is physically separate from Approach Control, but is located in the same building. It operates on a different frequency and has different responsibilities and functions.

9. At 0037–0038 GMT (8:37–38 P.M. E.D.T.) 89 Yankee informed the tower it was VFR at 4000 feet "on the 060 Burlington crossing the 142 Plattsburgh" (X–3) requesting a "full missed approach simulating procedure" under ILS. This position is approximately ten nautical miles northeast of the airport. Burlington Tower informed 89 Yankee that it had "numerous F–102 jets in the pattern" and requested 89 Yankee to "delay" his actions for about ten minutes. 89 Yankee responded "Affirmative." This, the last communication with the plane, concluded with the tower's reply—"Call me in about ten."

10. At approximately 0040 GMT (8:40 P.M. E.D.T.) 89 Yankee crashed into the west side of Mt. Mansfield in the town of Stowe, Vermont, at an alti-

[1]. ILS means that the pilot flies a landing pattern based on course, descent and range information transmitted to the aircraft by fixed transmitters on the ground. Unless instructed otherwise, the pilot flies this procedure under VFR.

tude of approximately 3800 feet, on a heading of approximately 100 degrees, at an angle of approximately one-half degree nose down attitude. This is approximately seven nautical miles from the point of the 0038 GMT radio transmission. Mt. Mansfield's two peaks are 4393 feet and 4192 feet above mean sea level. There are no obstruction lights to aid pilots at night. Mt. Mansfield is difficult to see on a dark night.

11. On October 6, 1966, approach control at Burlington International Airport was serviced by Air Route Surveillance Radar (ARSR) with an effective range to 140 miles. On the night of October 6 the ARSR ten inch radar scope was set to have an effective range of approximately 40 miles. The controllers in approach control monitor a green line, representing the ARSR antenna, which sweeps the scope every ten seconds. When the radar signal reaches an object, a "target" or "blip" is depicted on the radar screen as the green line sweeps around. The blip slowly fades as the line sweeps past. The approach control radar was also equipped with a Moving Target Indicator (MTI) which eliminates the blips which might otherwise depict stationary objects. The MTI equipment was operating during the evening of October 6. The radar scope is equipped with a video overlay map which marks and depicts prominent obstructions, such as Mt. Mansfield, although these marks are not to scale. Radar does not depict or provide aircraft with altitude information or indicate changes in altitude by an aircraft.

12. On October 6, 1966, during the time under inquiry, the arrival radar scope at approach control was manned by Anthony P. Torchia, an Assistant Air Traffic Controller. Behind Mr. Torchia's shoulder and monitoring his performance, stood Raymond Verville, an Air Traffic Control Specialist. Mr. Verville was never in voice contact with any of the planes in the area. Between 0018 and 0036 GMT (8:18 and 8:36 P.M. E.D.T.) Torchia was in communication with only five planes, four F–102 jets and 89 Yankee. The four jets were being handed over to the tower from approach control. The jets were operating under IFR flight plans being provided with vertical, horizontal and longitudinal separation, as well as navigational guidance. They were in the process of executing a series of ILS approaches to the same runway 89 Yankee requested. In these approaches, the jets utilized the ILS course which extends north of the runway to a point over the end of the runway at approximately 200 feet above ground level, then turning clockwise to fly the ILS course again. Each jet was "radar-identified" as part of the IFR procedures. Under radar identification, IFR planes are pinpointed and certified on the radar scope, either by the use of a transponder that magnifies the blip or by the use of special maneuvering turns. VFR planes who request radar identification may receive that service if available. 89 Yankee did not request the service, nor was it told that it was not radar identified.

13. The four F–102 jets were operating northwest of the airport and 89 Yankee was to the northeast. Verville watched the northeast quadrant of Torchia's scope for approximately 30 seconds at 0037 GMT (8:37 P.M. E.D.T.), or three sweeps of the radar. Verville never saw a blip around or near the positions reported by 89 Yankee. Torchia glanced at the northeast quadrant when 89 Yankee radioed in, but for only one sweep of the radar. He never saw a blip in that sector.

14. On October 6, 1966, tower services at Burlington International Airport were being performed by William A. Bartinoski. Bartinoski never saw 89 Yankee and requested the aircraft to delay for about ten minutes because of the danger of 89 Yankee's coming near the four ILS jets. He did not plot the position reported by the plane. He did not give the plane a holding pattern because it was flying VFR.

15. It is the duty of an air traffic controller to vector and warn an aircraft flying VFR when, in the judgment of

that controller, the vector is necessary for air safety. Air Traffic Control Procedures § 310.3(d). Within 40 miles of an airport site, the controller has a duty to aircraft that has been radar identified, to maintain a three mile separation between an aircraft and all prominent obstructions. ATC Procedures §§ 321.1 and 322.2. All pilots are required to familiarize themselves with the terrain along their route of flight. 14 C.F.R. 91.5. During VFR flight it is considered good pilot practice to remain at least 1000 feet above all terrain along the route of flight.

16. Aircraft flying VFR are not controlled until they get within five miles of the airport, at an altitude of 2000 feet and request permission to land. Experts called by both sides are agreed that if the pilot of the aircraft outside this area considers radar service is required, he should request it. Navigational guidance is given when the aircraft has been identified and the pilot informed that he is in radar contact.

17. A demonstration performed at the Burlington Airport September 8, 1972, indicated a plane of the approximate size of 89 Yankee, proceeding on the 060° radial on a 240° heading toward Burlington at an altitude of 4000 feet, turning east toward Mt. Mansfield can be intermittently identified as a blip on the arrival scope when the area of flight was kept under constant observation. Identification was lost during the course of the left turn at point X–3, which was considered to be similar to the turn of 89 Yankee prior to the crash.

18. 89 Yankee was never warned by either approach control or the tower that Mt. Mansfield was a hazard to air safety after the aircraft was instructed to "delay."

19. Decedent Rosen is survived by his widow, Betty, and two daughters, Karen and Gail. At the time of his death, Rosen earned approximately $20,000 per year, with a life expectancy of 28 years. He was the sole support for his wife and two daughters, contributing $10,000 per year to his wife's support, and expecting to shoulder the full expenses of his daughters' college and graduate education. The Rosen Estate has received the sum of $50,000.00 from the other defendants in this action.

20. Decedent Shefler is survived by his three children, Andrea, Harley Sue and Matthew. Shefler earned approximately $5,000 per year at the time of death, but would have earned approximately $40,000 per year by 1971. His life expectancy was 32 years. He and the children were devoted to each other and he provided parental guidance and direction to them. The Shefler Estate has received the sum of $50,000.00 from the other defendants in this action.

## Opinion

The common theme of the plaintiffs' claim of negligence is threefold. They contend that the air traffic controllers failed in the duty to use reasonable care to identify 89 Yankee on their radar scope, to inform the crew if they could not identify it and, lastly, to warn the aircraft that it was headed toward Mt. Mansfield at an unsafe altitude.

Since the action arises under the Federal Tort Claims Act and the accident occurred in Vermont, the claim of negligence must be measured by the law of this state. 28 U.S.C. § 1346(b); 5 V.S.A. § 145; United States v. Schultetus, 277 F.2d 322, 325, 86 A.L.R.2d 375, 380 (5th Cir. 1960). Foresight of danger lies at the foundation of negligence. And knowledge of danger or the opportunity for knowledge is essential to the legal duty which the plaintiffs seek to assign to the defendants. Thompson v. Green Mountain Power, 120 Vt. 478, 483, 144 A.2d 786 (1958).

Standards for measuring the air traffic controller's duties to aircraft in his control zone are prescribed in the Air Traffic Control Procedures (14 C. F.R. 617). These regulations have the force and effect of law. Hochrein v. United States, 238 F.Supp. 317, 319 (E.

D.Pa.1965); United States v. Schultetus, supra.

The plaintiffs rely on A.T.C. Procedures § 322.2:

> Within 40 miles of an antenna site, separate aircraft from prominent obstructions shown on the radar scope (displayed on the video map, scribed on the map overlay or displayed as a permanent echo) by a minimum of three miles.

The separation regulation, upon which the plaintiffs rely, relates to radar identified aircraft and the separation of two or more planes on take-off and in descent or climbing. It does not appear to control an aircraft flying under visual conditions in a hold pattern. A.T.C. Procedures § 321.1.

The main responsibility for the safe flight of aircraft in the control zone under visual flight conditions resides with its pilot. "Nonetheless, before a pilot can be held legally responsible for the movement of his aircraft he must know, or be held to have known, those facts which were then material to the safe operation of his aircraft." Hartz v. United States, 387 F.2d 870, 873 (5th Cir. 1968).

The flight personnel in 89 Yankee were not itinerant pilots, unfamiliar with the terrain in the control area. Operating under visual flight procedures and visual weather conditions, the pilot had to know his altitude in relation to the height of Mt. Mansfield, which he had cleared at the time of his last radio communication with the tower. Thus there is nothing in the facts developed in the record to relieve the operating personnel of their primary and ultimate responsibility for the safe operation of the aircraft. In this context, the duties of the air controllers are secondary. United States v. Schultetus, supra, 277 F.2d at 328; Tilley v. United States, 375 F.2d 678, 682 (4th Cir. 1967). To this responsibility attaches the continuing duty to be aware of perils which he can perceive, or understands from the use of his own senses.

Thingulstad v. United States, 343 F. Supp. 551 (S.D.Ohio, 1972). And although, as the plaintiffs' expert testified, the mountain is difficult to see on a dark night, its presence and altitude had to be known by the exercise of reasonable care by one flying the corridor from Newport to Burlington. See, El Paso Natural Gas Co. v. United States, 343 F.2d 145 (9th Cir. 1965). Such knowledge was essential to careful operation and is the equivalent of knowledge itself. Thompson v. Green Mountain Power Corp., supra, 120 Vt. at 483, 144 A.2d 786.

Had the pilot entertained concern about the presence of this danger, it was incumbent upon him to request radar identification. Such a request was never made. Absent this procedure, the personal custom followed by the controller Torchia of warning a radar-identified plane of the height of Mt. Mansfield, was not invoked and could not be followed.

The plaintiffs refer to various sections of A.T.C. Procedures. All appear to relate to instrument flight and aircraft which have been radar identified. Neither of these conditions prevailed during the time 89 Yankee was in the Burlington control zone.

Lastly, the plaintiffs maintain that the air controllers were required to warn the decedents of the dangers of Mt. Mansfield, since the peril was reasonably apparent to those responsible for air traffic control at Burlington. And the court recognizes that such a duty may prevail, even though the posture of the impending danger is not specifically provided for in the A.T.C. regulations. American Airlines, Inc. v. United States, 418 F.2d 180, 192–193 (5th Cir. 1969). Hochrein v. United States, supra, 238 F.Supp. at 320.

The plaintiff places much reliance on *Hochrein*. There it was held the traffic controller had a duty to warn the decedent of the presence of a non-radio equipped aircraft flying the same landing pattern, but behind, above and outside the decedent's plane. The non-radio

aircraft was making practice landings on the safe runway which the controller had previously given clearance for the decedent's landing. It was of critical importance in *Hochrein* that the plane following the decedent had failed to acknowledge two prior cautionary signals from the tower. The court concluded that the air controller should have been aware of the possibility that the second plane not only did not see the visual signals from the tower, but did not see the decedent's plane as well. The failure of the controller to warn the decedent of the emergency, and the danger to the decedent's landing, constituted negligence that was a cause of the ensuing collision. The duty to warn generated from superior knowledge. Rosenthal v. Trans World Airlines, Inc. (S.D.Ohio, 1972).

 Clearly in *Hochrein* the air controller had superior knowledge of the impending danger that was not known to the decedent. But the evidence in the case at hand fails to reveal that the defendant's air controllers had any knowledge of danger to 89 Yankee that could not be assigned to its flight personnel. To the contrary, 89 Yankee was never radar identified and had not requested such identification. The aircraft was proceeding on a course that had already cleared Mt. Mansfield. Danger from this terrain feature required a change in direction and a reverse of course. At the time of the final radio contact with the tower at X–3, the aircraft was heading 240° south toward Burlington, at a distance of 7 or 8 nautical miles from the mountain. At X–3 the tower inquired of the aircraft if it could delay for ten minutes. The response was affirmative and the tower requested— "Call me in about ten"—to enable the controller to divert his attention to the numerous F–102's in the area.

The facts established in the record fail to disclose that the air traffic controllers violated their duty of reasonable care in failing to identify 89 Yankee on the radar scope and in not informing the aircraft that it was not radar identified.

Since the defendant's air traffic controllers had no knowledge that 89 Yankee was headed toward Mt. Mansfield at an unsafe altitude, there was no violation of duty in failing to issue a warning to this effect.

The plaintiffs have failed to establish that any act or omissions of the defendant's air controllers on duty at the Burlington International Airport on the night of October 6, 1966, constituted the proximate cause of the accident which took the lives of the decedents whom the plaintiffs represent in their combined actions.