Sarnak *v.* Cehula, Appellant.

Argued April 24, 1958. Before JONES, C. J., BELL, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*G. Clinton Fogwell, Jr.,* with him *Philip J. Reilly, Harold K. Wood,* and *Reilly, Wood and Fogwell,* for appellant.

*Joseph G. McKeone,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 3, 1958:

Two motorists were driving through the shadows of the night (June 10, 1950, 1:55 a.m.) on Route No. 83 between Spring City and Phoenixville, when they beheld in the rays of the headlights of their car the remains of a tragedy of the road. An overturned Oldsmobile four-door sedan, with its wheels pointing to the sky and its roof hugging the ground, lay in the field some fifteen feet west of the 30-foot highway on which they were traveling. The upper part of a human body with a blood-smeared arm suspended limply through the shattered windshield of the wrecked automobile, the feet of another body projected out from beneath the capsized roof. A few moments later two other motorists arrived on the scene, and the assembled four men lifted the car over to its wheels, releasing the bodies imprisoned within the wreckage. It developed later that the person who had been thrown through the windshield was a young man named Stephen Cehula. The one who had been pinned beneath the roof was a youth called Stephen Sarnak. The door on the driver's side of the car was still closed, with the lower part of Cehula's body wedged behind the driving wheel. The front door on the opposite side of the car hung open.

A few minutes later a state policeman, Wm. F. Petrie, arrived and proceeded to make observations and measurements in the endeavor to reconstruct the movements of the car prior to the disastrous termination of its ill-starred journey. On the highway at this point lay two pieces of a 40-foot telegraph pole; a third piece, being the upper extremity, dangled from the wires which it had originally upheld. The lowermost section of the pole had been uprooted from the hole in which it had been imbedded. This hole measured 10 feet from the car. From this evidence, no great deductive talent

is required to conclude that the automobile had collided with the pole and it was this sudden stoppage which threw Cehula through windshield to his death and catapulted Sarnak through the passenger's door to the ground where the car folded over him. Miraculously, Sarnak escaped death but he did sustain serious injuries, because of which he brought an action in trespass against the estate of the deceased Cehula, charging him with negligence in the operation of the car.

Since Stephen Sarnak, under the Act of May 23, 1887, P. L. 158, §5 was not permitted to testify, and since there had been no spectator to the happening of the catastrophe, the defendant administratrix of the estate of the deceased Stephen Cehula moved for a compulsory nonsuit and, later, for binding instructions, contending that there was no evidence that Cehula was actually driving the car at the time of the crash, nor was there evidence, if it should be established he actually drove the car, that he had driven it negligently. The trial judge refused both motions and the jury returned a verdict in favor of the plaintiff. The defendant has appealed, urging upon us what was urged below.

Evidence in personal injury actions is not restricted to oral testimony. Physical objects and markings, under certain circumstances, may speak with a tongue more eloquently convincing than that of any human being. The fact that the telegraph pole, (also referred to as a utility and telephone pole), which was twelve inches in diameter and forty feet in height, had been violently unearthed and torn into three chunks, speaks conclusively of the velocity with which the car was moving when it encountered the pole.[1]  Four-wheel

---

[1] *Simon v. Mocns*, 356 Pa. 361.

skid marks in the road which extended diagonally from the base of the pole for 125 feet to the berm on the eastern side of the road told the incontrovertible story of a car traveling beyond the control of the driver.[2] This deduction is reinforced by the tire marks in the berm which extended for 60 feet back to a curve in the road. These writings on the highway tell the oft-related tale of the motorist who goes into a curve at a greater centrifugal speed than is prudent,[3] who consequently swings over the center line to his wrong side of the road, and even over to the berm, and who, in that moment of fear and bewilderment, adheres to the berm and then finally decides to get back to his side of the road by cutting his wheels sharply, who skids, who then throws on his brakes, and whose car now achieves the momentum of a sled on ice which can only be stopped when its momentum has been spent, or another car, or a human being, or a telegraph pole appears in the way, when both the missile and the target both suffer breakage, mangling, and sometimes complete destruction. The jury so read the story, and we cannot say they erred in the reading.

There was another item in the narrative of the highway. Four or five hundred feet south of the spot where the Oldsmobile collided with the telegraph pole a dead dog (described only as a "huge dog") was found lying in the road at the center of the curve. The defendant appellant theorized in her brief that as the driver was rounding the curve at a speed no greater than the statutory fifty miles per hour the "huge dog" appeared in his path and in an effort to avoid hitting it, he swung to the right and on to the berm, and, in seeking to get back to the road, crashed into the pole. Since, the defendant argues, the driver had not exceeded the speed

---

[2] *Fabel v. Hazlett*, 157 Pa. Superior Ct. 416, 421.

[3] *Knox v. Simmerman*, 301 Pa. 1, 6.

limit and was suddenly confronted with an emergency, he should not be held liable for what followed. This theory was submitted to the jury and the jury rejected it as not fitting into the blueprint of the accident drawn by the skid marks, the disjointed pole, and the overturned car, all of which spelled out an excessive speed. Even if it were to be assumed that the "huge dog" appeared before the car, this fact would not of itself acquit the driver of the negligence of driving at such a rate of speed that a deflection in his course completely threw the car out of his control. This Court well said in the case of *Casey v. Siciliano*, 310 Pa. 238, 242: "When the driver of an automobile claims that he has been subjected to a sudden emergency in driving on the highways, to enable him to claim the benefit of this rule, it must appear that he was not driving in a reckless or careless manner, but with due regard to the condition of the highway and the traffic."

We do not believe that there is any merit to the defendant's contention that the plaintiff failed to prove that Stephen Cehula was the driver of the Oldsmobile car. To begin with, Cehula's body was found behind the steering wheel in such a posture as to exclude the fantastic possibility that his and Sarnak's body had exchanged positions between the moment of the fatal crash and the moment the passing motorists appeared on the scene. Then, there was testimony that an hour before the collision, Cehula was seen to enter the car and take the driver's seat. There is always in life the general assumption that when there is no necessity for a change and every likelihood argues against a change, an acknowledged state of affairs will be accepted as continuing until evidence or substantial reason proves the contrary.[4] There is not a spark of evidence or a

---

[4] *Flick v. Shimer*, 340 Pa. 481, 484.

shadow of reasonable inference to support any assumption that Cehula, after setting out on the journey an hour before the crash, gave up the steering wheel to the passenger Sarnak. And then there is the additional factor to consider, namely, that Sarnak was not a licensed driver, even though he had obtained a learner's permit in 1949.

A review of the record more than amply confirms the conclusion reached by the jury that Stephen Cehula was driving the Oldsmobile car at the time of the tragic collision.

Even giving to the decedent the benefit of the presumption that a deceased driver exercised due care, the evidence still shows that the speed with which he operated the car while entering the fateful curve constituted the proximate cause of the mishap which tragically snuffed out his own life and visited serious injuries on the plaintiff.

Judgment affirmed.