Newsome *v.* Baker, Appellant.

Argued January 9, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and McBRIDE, JJ.

*J. Webster Jones,* for appellants.

*Harvey B. Levin,* with him *Bernstein & Bernstein,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, March 16, 1959:

Edward B. Herbst, Trooper in the Pennsylvania State Police, was patrolling the Pennsylvania Turnpike on the night of May 11-12, 1956, when, at 2:45 a.m., he learned, by radio communication, that an accident had happened on the Turnpike in the vicinity of Harrisburg. He sped to the reported point. As he approached Milepost 246.8, two miles east of the Harrisburg East Shore Interchange, he beheld the closing scene of a highway tragedy. In the field south of the highway, an automobile, upside down, was in flames, shedding an illumination which disclosed in its immediate vicinity an unconscious woman on the ground, surrounded by three small boys running about, dazedly and in apparent shock. He called for an ambulance for the woman and children, but could not approach the car until the fire, which enveloped it, had run its course. When, with the help of other motorists who had arrived on the scene, the car was righted, the body of the driver was found within. The driver, it developed, was Nathaniel Baker, also owner of the car. He was dead.

The injured woman, whose name was Mrs. Marie Newsome, brought suit in her own name and in the names of her three young sons, against the administrators of the estate of Nathaniel Baker, and recovered verdicts, the amounts of which are not in dispute. The administrators of the deceased Baker, however, ask this Court to reverse the verdicts of the jury and enter judgments in favor of the defendants, averring that the alleged negligence of Baker was based wholly on circumstantial evidence which did not prove that the deceased driver was the person responsible for the accident.

It is true that no witness testified to having seen the accident occur and it is true that the evidence presented by the plaintiff was wholly circumstantial. But this does not mean that it is impossible to fix responsibility for the deed which took a car off the highway with such violence that it perished in flames, killed the driver, and seriously injured the passengers.

It is a reassuring fact, in the phenomena of life, that most mishaps, which are not witnessed by reportable human beings, leave behind them physical writings which clearly spell out the reason for the untoward event, and when those writings conclude with a precise, unerring explanation of the event, it would be a defiance of the law of cause and effect to ignore the explanation. It is one of the oddities in human affairs that there still exists the notion that circumstantial evidence cannot be as convincing as oral testimony. But a broken wheel with splintered spokes can tell its story of a weakened structure as clearly as it can be told by one who saw the wheel failing and disintegrating. A buckled fender, a pulverized curb, a fragmentized window glass may speak of violence as eloquently as any gifted narrator or writer. We said in *Sarnak v. Cehula,* 393 Pa. 5, 7, that "physical objects and markings, under certain circumstances, may speak with a tongue more eloquently convincing than that of any human being."[*]

One of the first things which struck the eye of Trooper Herbst, after arriving at the scene of the accident, was the fact that a section of the guard rail flanking the highway had been torn away, carrying with it four guard posts to which it had been attached.

---

[*] Hamlet spoke most eloquently, on a graver subject, when he said:

"For murder, though it have no tongue, will speak
With most miraculous organ." (Act 2, Scene 2.)

It did not require the talents of a Dupin or Sherlock Holmes to deduce from this brute reality that the flaming car now on its back and only 98 feet away and over the embankment had broken this guard rail—especially in view of the fact that Herbst had passed this very spot an hour before the accident when the guard rail was intact, and particularly in view of the fact that Herbst arrived at the point of the breakthrough only 4 minutes after the breakthrough occurred.

After Mrs. Newsome and her children had been transported away by ambulance, Trooper Herbst proceeded, with the practised eye of a veteran investigator of highway accidents, to study the terrain, note all unusual phenomena, and make appropriate measurements. In this examination he was assisted by another State Trooper and the dawn which now illumined the tracks which had been made by the fatal car, a 1956 Pontiac Sedan, from the moment it first left the paved highway until, after its crazy course on and off the concrete, it pierced the guard rail and plunged over the embankment to its doom.

From the point of breakthrough, and for a distance, in an eastward direction, of 54 feet from the berm, Trooper Herbst found skid marks 4 inches deep. Here the marks swerved to the highway and followed the highway for 128 feet, measuring backward toward the East, the direction from which the car had come. Then to Milepost 246.9 the marks tore into the berm for 36 feet, and then beyond the indicated milepost the marks, still on the berm, continued for 534 feet.

For one travelling in a westward direction, which was the course of the Pontiac car, the Pennsylvania Turnpike at this point curves to the driver's left. The physical writing in the berm and roadway told the indisputable story of a driver who, travelling at a high rate of speed in rounding a curve, swings into the arc

beyond the paved portion of the highway, then cuts back fiercely into the highway but in doing so loses control, the car now wildly pivoting and spinning, hurtles back to the berm, and the driver, facing catastrophe, forces the brakes to their ultimate pressure, thus locking the wheels, converting the car from a rolling vehicle into a sled which, obeying now only the forces of momentum and still helpless in the original centrifugal sweep, leaves the highway completely and catapults over the embankment. In describing the automobile marks on the road, Trooper Herbst said: "The marks were of such a nature to indicate to me that they were made by a tire, there were just brush or rubber brush marks on the roadway, indicating possibly the car was spinning."

That the car did spin was confirmed by the physical condition of its remains, which showed that the rear was completely smashed, whereas the forward part was undamaged. Obviously the car went over the embankment backwards.

The speed limit at this stretch of the Turnpike is 45 miles per hour. The jury which heard the case could easily conclude that the Pontiac was travelling far beyond the speed limit (or was being carelessly or recklessly driven) when they reflected on the incontrovertible facts that the car had smashed through a section of guard rail and four guard posts, had hurled the passengers out of the car so that they were found 30 feet away from the roadway and 75 feet from the car, and that the car itself had travelled 98 feet from the roadway and then burst into flames.

The defendants state that they are entitled to the benefit of the presumption that the decedent driver used due care. The observation is a valid one. The decedent is indeed presumed to have used due care, in the absence of evidence that he abused due care. This

question came before us in the case of *Sarnak v. Ce-hula,* 393 Pa. 5, 10, where we said: "Even giving to the decedent the benefit of the presumption that a deceased driver exercised due care, the evidence still shows that the speed with which he operated the car while entering the fateful curve constituted the proximate cause of the mishap which tragically snuffed out his own life and visited serious injuries on the plaintiff."

In *First National Bank v. Simko,* 384 Pa. 603, 605, we said: "It needs no argumentation to demonstrate that in the ordinary course of events an automobile does not depart from the highway and crash into a telegraph pole if the driver is using proper care. Thus, the defendant here was called upon to show how, consistent with due care, his car sheared through a telegraph pole and visited death upon the passenger in his charge. The defendant made no effort to contradict the physical facts which bespoke negligence on his part. It was for the jury, then, to decide, whether under all the circumstances the plaintiff had proved the defendant negligent and that it was his negligence which caused the untimely death of Mrs. Burkholder."

While the presumption of due care attaches to a deceased driver, the presumption does not relieve his representative from the need of overcoming specific and definitive evidence which wipes out the concept of due care. In the case at bar the jury was justified in finding that the uncontradicted evidence practically conclusively established that the driver did not exercise due care.

The jury found from the evidence that Nathaniel Baker was negligent in the manner in which he operated his car, and we are satisfied that the record amply supports the jury's verdicts.

Judgments affirmed.