The foregoing embodies the order of the court. No settlement is necessary.

See also D.C., 259 F.Supp. 573.

Patricia Meryl **GATENBY** and Percy Evans, Administrators of the Estate of Ian Alexander Gatenby, Deceased

and

May Thora Mole, Executrix of the Estate of John Henry Mole, Deceased, Plaintiffs,

v.

**ALTOONA AVIATION CORPORATION**

and

Paul Peterson, Defendants.

Civ. A. No. 64–1074.

United States District Court
W. D. Pennsylvania.

May 25, 1967.

Hymen Schlesinger, Pittsburgh, Pa., David Rein, Washington, D. C., for plaintiffs.

Burns, Manley & Little, Pittsburgh, Pa., for defendants.

## OPINION

WEBER, District Judge.

This case involves an action for the death of two passengers for hire in an air-taxi plane owned and operated by defendants out of Peterson Field, located about ten miles northeast of Altoona, Pennsylvania, on the main highway between Altoona, Pa., and Tyrone, Pa. On December 8, 1963, the pilot of defendants' plane took off from Peterson Field at about 1 p. m. to pick up two passengers at the Washington, D. C. airport. At about 1:26 p. m., the pilot received a weather briefing from the Phillipsburg, Pa. flight service station while enroute to Washington, D. C. Phillipsburg is the closest weather reporting station to Peterson Field being located about twenty-three miles northwest. The weather report showed a cold front moving on a north-south line from Eastern Ohio into Western Pennsylvania at about twenty knots per hour. At Washington, D. C. at 2:55 p. m., the pilot picked up his two passengers to transport them to University Park, Pennsylvania. The pilot departed Washington, D. C., without a further weather briefing but while enroute over Frederick, Maryland at 3:12 p. m., received a weather briefing from the pilot-to-forecaster service that in-

formed him of near minimum visibility conditions for FAA Visual Flight Regulations [1] along the line of his flight, and of turbulence and moderate icing conditions enroute throughout the line of his flight. At 3:17 p. m., a special weather broadcast from the Phillipsburg station indicated less than visual flight regulation conditions in the area of his home field. The pilot could have heard this report with his equipment had he been tuned to that station or could have received it at any time on request. This report was repeated at the regular broadcast time of 3:45 p. m., by all weather stations along his route.

The pilot was unable to land at University Park Pennsylvania, because the field was closed by adverse weather conditions that prevented landing under Visual Flight Regulations. University Park is approximately twenty-eight to thirty miles southeast of Phillipsburg. At about 3:50 p. m., the pilot contacted his employer at Peterson Field advising him that he could not land at University Park and was returning with his passengers to Peterson Field. The compass course from University Park to Peterson Field was approximately 226° (southwest). The pilot reported that he was over Port Matilda, Pa., which is approximately 270° (due west) of University Park and about twelve miles distant. At that time the ceiling was about 800–1000 feet at Peterson Field. At 3:59 p. m., the plane crashed into the side of a mountain in a heavy snow storm with ceiling and visibility zero. The plane crashed

1. The FAA (Federal Aviation Agency) was established by the "Federal Aviation Act of 1958", Pub.L. 85–726, 72 Stat. 737, 49 U.S.C. § 1301 et seq., Title III, Sec. 307(c) provides:
"The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and

land or water vehicles, and between aircraft and airborne objects." 49 U.S.C. 1348.
The Regulations are published in 14 C. F.R., Aeronautics and Space.
These rules and regulations have the force and effect of law. Hochrein v. United States, 238 F.Supp. 317 (E.D.Pa., 1965); United States v. Schultetus, 277 F.2d 322, 86 A.L.R.2d 375 (5th Cir., 1960).
The terms Visual Flight Regulations and Instrument Flight Regulations are sometimes abbreviated as VFR and IFR herein.

at an altitude of twenty-six hundred feet, 150 feet below the summit of the mountain. The site of the crash was Bald Eagle Mountain, about ten miles southwest of Phillipsburg and about fifteen miles northeast of Peterson Field. The site of the crash is 270° (due west) from University Park. At the time of the crash the plane was in level sustained flight, cruise condition.

The plane was not equipped at the time for Instrument Flying Regulations under the applicable Federal Aviation Agency Rules. It was not multi-engine with dual controls, it had no co-pilot. It is undisputed that the plane could not legally operate under Instrument Flying Regulations. The evidence of the weather conditions at University Park, Phillipsburg, Pa., and the Peterson Field showed that less than minimum visibility conditions for Visual Flight Regulation operation prevailed at these three points of a roughly equilateral triangle in the area of the pilot's destination, since the conditions were less than those which permit VFR flight, a ceiling of 1,000 feet and visibility of one mile. These had prevailed at Phillipsburg since 3:17 p. m., at University Park at 3:50 p. m., and for sometime prior thereto, and at Peterson Field at 3:55 p. m., and at Bald Eagle Mountain, within the area of the triangle, at the time of the crash. Since the pilot could not continue his flight under VFR conditions the pilot was attempting instrument flight contrary to the IFR provisions.

■ The plaintiffs allege negligence by reason of the violation of several applicable FAA regulations and by reason of the violation of the "highest standard of care" owed by a common carrier to its passengers. The violation of both the FAA regulations and the "highest standard of care" was established by an almost overwhelming preponderance of the evidence. The jury returned a verdict for the defendants in the face of the great weight of evidence of liability. The defendants' evidence to dispute liability was fragmentary and speculative. It is the opinion of the court that the verdict of the jury for defendants is so contrary to the great weight of the evidence as to represent a capricious disregard of the evidence by a jury. We are firmly convinced that a new trial is demanded to prevent an unjust result. Fed.R. of Civ. P. 59 [a]. Magee v. General Motors Corp., 213 F.2d 899 (3rd Cir. 1954). This is a principal not only of the controlling federal law which governs this action but of the law of Pennsylvania, the state of the forum in which the action was tried. Clewell v. Pummer, 388 Pa. 592, 131 A.2d 375 (1957). Eisert v. Jones, 408 Pa. 73, 182 A.2d 717 (1962); Brandon v. Peoples Natural Gas Co., 417 Pa. 128, 207 A.2d 843 (1964).

■ We turn now to Plaintiffs' Motion for Judgment N.O.V. Does the record compel the Court to grant this motion despite our prior refusal to direct a verdict on liability for the plaintiff at the close of all testimony in this case? At the outset we believe that the consideration of plaintiffs' motion is to be decided by the Federal standards which provide that the Court shall direct a verdict in favor of the party having the burden of proof if the evidence established the facts in his favor so clearly that reasonable men could entertain no doubt with regard thereto. Byrd v. Blue Ridge Rural Elec. Co-op., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Herron v. Southern Pacific Co., 283 U.S. 91, 51 S. Ct. 383, 75 L.Ed. 857 (1931).

"The quantity and quality of proof necessary to make out a case for submission to a jury in a federal court are determined by the Seventh Amendment to the Constitution of the United States, the Federal Rules of Civil Procedure, and the decisions of the courts of the United States." (citations omitted). Isaacs v. American Petrofina, 368 F.2d 193 (5th Cir., 1966).

Defendants dispute that the federal rule is applicable and argues for the application of a rule established in Pennsylvania that, "From time immemorial, it has been the province of the jury in trespass cases, where oral testimony is concerned, to pass upon the credibility

of witnesses, even though uncontradicted by defendant witnesses or even though the defendant introduces no testimony at all." Dorn v. Leibowitz, 387 Pa. 335, 127 A.2d 734 (1956). Defendants further argue that plaintiffs' case depends in a large measure upon expert testimony to which relatively little weight should be given under Pennsylvania law.

In examining the *Dorn* case, we are impressed as was the Pennsylvania Supreme Court with the fact that after directing the verdict for the plaintiff, the trial judge awarded a new trial. In sustaining that order the court considered briefly and without citation the rule as quoted above. The rule has been repeated in Williams v. H. E. Stoudt & Son, Inc., 404 Pa. 377, 172 A.2d 278 (1961) and in Kopar v. Mamone, 419 Pa. 601, 215 A.2d 641 (1966). However, all of these cases involved the testimony of the injured plaintiff in a trespass case, upon whose credibility the entire case rested. In the *Williams* case the matter was tried before a judge without jury and the issue was whether the judge was bound by plaintiff's uncontradicted testimony, or was free to disbelieve it. The opinion held that credibility was a matter for the trier of facts.

▮ The rule has been applied to extreme lengths in Pennsylvania. In Elia v. Olszewski, 368 Pa. 578, 84 A.2d 188 (1951), a contract case, the court held:

"While it is true that however indisputable may be the proof resting on oral evidence, a trial judge may not assume its truth even though uncontradicted to the extent of directing a verdict or entering judgment n. o. v., yet this does not mean that a perverse or capricious verdict or one plainly against the weight of the evidence must be allowed to stand. *The remedy is to grant a new trial*, (citations omitted) *and repeatedly if necessary.*" (emphasis supplied).

But this is not a rule of universal application in Pennsylvania. It is not so applied at the conclusion of plaintiff's evidence in cases where defendant moves to dismiss, it is not applied when the court determines that here is clear and unmistakable evidence of plaintiff's contributory negligence. Murphy v. Bernheim & Sons, 327 Pa. 285, 194 A. 194 (1937); Pewatts v. J. C. Penney Company, 356 F.2d 586 (3 Cir. 1966).

It is not a rule of universal application. In Lonzer v. Lehigh Val. R. Co., 196 Pa. 610, 46 A. 937 (1900), the court held:

"But this rule is founded on common sense and knowledge of human nature, and must be limited by the same standards. When the testimony is not in itself improbable, is not at variance with any proved or admitted facts or with ordinary experience, and comes from witnesses whose candor there is no apparent ground for doubting, the jury is not at liberty to indulge in a capricious disbelief. * * * The verdict should have been set aside as in direct disregard of the evidence, and where that is the case the court may refuse to submit it at all, and direct a verdict accordingly. Holland v. Kindregan, 155 Pa.St. 156, 25 Atl. 1077, 46 A. p. 938."

▮ Our view of the Pennsylvania cases is that the "oral evidence" rule is a procedural rule confined in its application to cases where the evidence comes solely or largely from the oral testimony of an interested witness, the plaintiff himself. "Aside from the question whether a fact issue of credibility is presented where an uncontradicted and in no way discredited witness gives testimony which, if accepted, controls the case, it has been held in a large number of cases that if the witness has a personal interest in the result, his credibility must always be regarded as involving an issue of fact which must go to the jury." 62 A.L.R.2d 1191. Annot. Credibility-Court or Jury Question, at p. 1198.

This is the meaning and the rationale of the Pennsylvania "oral testimony" rule. Second National Bank of Pittsburg v. Hoffman, 229 Pa. 429, 78 A. 1002 (1911). It is also a rule of the Federal courts, Sonnentheil v. Christian Moerlein

Brewing Co., 172 U.S. 401, 19 S.Ct. 233, 43 L.Ed. 492 (1899); Spero-Nelson v. Brown, 175 F.2d 86 (6th Cir. 1949). In Mihalchak v. American Dredging Co., 266 F.2d 875 (3rd Cir. 1959), a case arising under the Jones Act, the Court of Appeals for this Circuit held:

> "Most of (plaintiff's) case rested on his own testimony, while the defendant put in no evidence at all on the issue of how the accident happened. In passing on a motion for directed verdict all evidence and inferences most favorable to the party against whom the motion is made must be indulged. Always when the motion is made by the proponent there is a problem of the credibility to be attached to his evidence, for if it is disbelieved in important degree his motion must fail. And yet there must be some reason other than caprice for disregarding the proponent's evidence to any significant extent.
>
> Here adequate reason for leaving questions of credibility to the jury lay in the facts that the chief witness had an obvious interest in the case, that the testimony as to how the accident occurred was not very explicit, and that a considerable measure of improbability prevented the conclusion that the dog simply had slipped out of the gear. We conclude, therefore, that the trial judge correctly refused to direct a verdict * * *." (p. 878)

■ We conclude that the "oral evidence" rule in Pennsylvania is primarily a procedural device to guide the trial court in determining whether there is an issue of fact to submit to the jury. The issue is credibility of the witness, and where the issue is lacking, as where there is no reason to doubt his candor, then the reason for the rule falls. In the present case no interested witness testified for plaintiffs on the liability question. They are dead. The testimony was all from independent witnesses, largely recounting physical facts, the existence of which was not disputed, and the existence or non-existence of these facts was equally open to verification by defendant.

There being no state rule of substantive law at issue, we believe the matter is controlled by federal standards. 5 Moore's Federal Practice (2nd ed.) ¶ 38.10 advocates this rule. "But the sufficiency of certain evidence to raise a question of fact for the jury, or for the court where trial is without jury, should not be controlled by state law." While Moore cites a substantial body of cases from the various federal circuits in support of his proposition, he also notes that the Supreme Court has specifically avoided the problem in Dick v. New York Life Ins. Co., 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), awaiting a case where the issue is directly raised, briefed and argued. Moore notes as "contra" the rule of three cases of the Court of Appeals for the Third Circuit, and states (p. 102 fn.): "Most, if not all, of these 'contra' cases are only superficially opposed to the position stated in the text, for usually the question posed was partly as to what facts would constitute a cause of action, undoubtedly a substantive matter, and partly as to the requisite measure of proof."

In the Third Circuit cases noted, Cooper v. Brown, 126 F.2d 874 (3rd Cir., 1942), the Court applied the state's "best evidence rule" as a matter of substantive law in the interpretation of a contract. In Waldron v. Aetna Casualty & Surety Co., 141 F.2d 230 (3rd Cir. 1944), the opinion shows the existence of conflicting facts and circumstances which required a determination by the jury even under the federal standard. In Lennig v. New York Life Ins. Co., 122 F.2d 871 (3rd Cir., 1941), the court dealt with the effect, under Pennsylvania law, of the probability of accident rather than suicide, where the evidence is otherwise evenly balanced. Such probability is a matter for jury consideration under Pennsylvania law in life insurance cases.

■ We conclude that this federal court is not bound, under the *Erie* rule, to submit this matter to a jury solely because of the "oral testimony" rule, if the evidence is otherwise conclusive.

What then is the standard upon which we determine the plaintiffs' motion? In Mihalchak v. American Dredging Co., 266 F.2d 875 (3rd Cir., 1959), the court provided the following standards:

"From the form of the pleadings he had, on both of these issues, the risk of non persuasion—the persuasion burden—and the accompanying initial risk of non-production of evidence or the production burden. The question raised by plaintiff's motion for a directed verdict, then, is whether he had so well succeeded in carrying his burden of producing evidence that he was entitled to a verdict in his favor as a matter of law."

"The propriety of directing a verdict in appropriate situations in favor of the party imposed initially with the risk of non-production of evidence seems to be well settled.[3] Yet though a motion for directed verdict in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. The ultimate conclusion that there is no genuine issue of fact[4] depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact in issue is at least inferable." (p. 877).

Apart from the argument that the matter must be submitted to the jury because of the "oral testimony rule", defendants' principal arguments are that

violation of applicable FAA regulations was not conclusively proven and that there was no evidence of the proximate cause of the accident. As to certain of the FAA regulations there may be some ground of argument. The failure of the pilot to secure a weather briefing before departing from the Washington airport may not be a clear violation of Reg. 42.51 (b) because the pilot had secured a weather briefing before leaving Peterson Field on the first leg of his journey, he secured a briefing in the air from Phillipsburg station shortly after his take-off from Peterson Field, and after taking off from Washington on the return flight he received a briefing from the Pilot-to-Forecaster Service. Likewise, the report from Pilot-to-Forecaster Service received over Frederick, Md. told of light to moderate icing conditions below 10,000 feet along the line of his route. It was a violation of FAA Regulation 42.54 to fly a plane unequipped with de-icing equipment, as was this one, into such conditions, but there is no clear evidence that icing conditions were the cause of the crash. Defendant further argues that the fact that the pilot reported to his home field about 3:55 p. m. that he was over Port Matilda establishes that the pilot was flying under VFR conditions at the time because he could see Port Matilda. Defendant's expert expressed his opinion that this report indicated VFR flight conditions, but he also admitted that the pilot could have estimated this location from his course and time elapsed. It was also testified that the pilot might have seen Port Matilda and yet have been flying below the minimum altitude requirements. Defendant's only other evidence to dispute the violation of the VFR rules was the opinion of its expert that the reports of local weather conditions did not always accurately report local conditions at a given moment, and that the only test was to go into the area and see. In es-

3. See e. g. 53 Am.Jur., Trials, §§ 385, 386; 9 Wigmore, Evidence § 2495 (3d ed. 1940); 5 Moore's Federal Practice ¶50.02.1.

4. 6 Moore's Federal Practice ¶59.04(5).

sence, this testimony was a positive invitation not only to violate the FAA regulations but to take the very risk that they were intended to prevent.

The Visual Flight Regulations require a minimum ceiling of 1,000 feet and visibility of one mile. This did not exist at Phillipsburg, at University Park, at Peterson Field, and at the scene of the crash. It was established without contradiction by the plaintiff's meteorologist that the pilot passed into a general area of less than minimum visibility at some point in his flight to University Park. If he could no longer see, the only conclusion is that he was attempting to fly by Instrument Flight Regulations. But this would be illegal also. While the plane was equipped with the necessary instruments, the IFR rules require that when passengers are carried the aircraft shall be multiengine with dual controls and that a second pilot shall be required.

The Minimum Flight Altitude Rules for day VFR flight require a pilot to fly over 500 feet above the surface and over 1,000 feet above any mountain, hill or other obstruction to flight. The IFR rules for minimum altitude require flight not less than 1,000 feet above the highest obstacle located within a horizontal distance of five miles from the center of the course intended to be flown.

The pilot was in territory that he knew well. There were long ridges of mountains along his course. The course from University Park to Peterson Field is about 240°, and from Port Matilda is about 226°. The pilot reported from Port Matilda that he was flying direct to Peterson Field. Yet within four or five minutes he crashed into a mountain 2,750 feet high at a point 150 feet below the summit, or at about 2,600 feet. The point of crash is due west or a course of 270° from University Park and Port Matilda. The pilot was not on his course to his home port, he could not see where he was going, and he was below the minimum altitude required. The plane was in a condition of sustained level flight, cruise condition, at the time.

■ The clear, uncontradicted physical evidence of the crash itself establishes a violation of FAA regulations which is negligence as a matter of law.

■ While it is true that the violation of a statute or regulation is not grounds for liability unless that violation was a proximate cause of the accident, nevertheless when the statutory standard of conduct is enacted for the purpose of avoiding the particular harm that ensues, the causal relationship is established.

"The statute itself charges one that its violation will result in an injury of the character sought to be prevented in its enactment. A statute having for its purpose the preservation of life and the minimizing of personal injuries may impose a duty which is greater than the duty of ordinary care as such duty exists at common law, but a person who is charged by the statute with the necessity of exercising increased diligence must perform such duty or bear the consequences of his neglect." 38 Am.Jur. Negligence § 160, p. 832.

It is obvious that the intention of the minimum flight altitude rules for both VFR and IFR flights were intended to prevent the airplane from crashing into obstacles in its line of flight. Yet, this is exactly what happened in this case. The plane followed a 270° course from University Park west passing over Port Matilda and crashing into Bald Eagle Mountain at an altitude of 2,600 feet in sustain level flight. The pilot was familiar with the area. Behind him at University Park there was less than minimum visibility conditions, to the southwest at Peterson Field, his intended destination, was less than minimum visibility conditions, to the northwest at Phillipsburg there was less than minimum visibility conditions, and directly ahead was Bald Eagle Mountain into which he crashed because he could not see it and because his altitude was less than the prescribed altitude for either visual or instrument flight. "If the injury complained of is a natural and prob-

able consequence of a violation of the statute, then that violation is correctly taken as the proximate cause of the injury. If the very injury has happened which was intended to be prevented by the statute law, that injury must be considered as directly caused by the non-observance of the law." 38 Am.Jur. Negligence § 166, p. 838.

"But the existence of an ordinance changes the situation. If a driver causes an accident by exceeding the speed limit, for example, we do not inquire whether his prohibited conduct was unreasonably dangerous. It is enough that it was prohibited. Violation of an ordinance intended to promote safety is negligence. If by creating the hazard which the ordinance was intended to avoid it brings about the harm which the ordinance was intended to prevent, it is a legal cause of the harm." Ross v. Hartman, 78 U.S.App.D.C. 217, 139 F.2d 14, at p. 15, 158 A.L.R. 1270 (1943).

"If the injury complained of is a natural and probable consequence of a violation of the statute, then that violation is correctly taken as the proximate cause of the injury. If the very injury has happened which was intended to be prevented by the statute law, that injury must be considered as directly caused by the non-observance of the law." Baltimore & O. R. Co. v. Green, 136 F.2d 88 (4th Cir., 1943)

Whether or not this pilot was off course because of lack of visibility or because he was attempting illegally to operate by instrument, whether or not he was misled by "magnetic variations" in the area, or a sudden snow storm, he was not fying at the prescribed altitude in mountainous terrain which he knew well. His failure to fly 1,000 feet from any mountain caused him to crash into that mountain. The question at issue is not what caused the pilot to depart from this standard. The record is bare of any evidence as to this. The question of causation is solely whether the pilot's flying on a course due west from University Park at an altitude of 2,600 feet caused

him to crash into a mountain 2,750 feet high directly in the path of his course. We think that only one reasonable rational conclusion can follow, that the violation of the altitude regulation was the legal cause of the crash and the consequent damages.

■ There is another aspect to the claim of negligence here. The deceased passengers were passengers for hire on an airplane owned and operated by defendants as an air-taxi service. The defendant corporation operated several planes of different types and was so licensed to operate and fly to any part of the United States. As such a public carrier it owes its passengers a high degree of care. Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964).

■ The evidence in this case is replete with instances of lack of due care, and that evidence is almost wholly uncontradicted or unrebutted. When the pilot started his flight there was a weather report which he received of a storm front moving into the area from the west. While the speed of its reported movement was such that he might have expected it not to arrive until he had completed his flight, it should have alerted him. He secured no weather briefing on the ground at Washington, D. C. before taking off, but when airborne over Frederick, Md., received a report that foretold deteriorating conditions. These should have alerted him to listen for future reports and be specially observant. In one respect it told him of icing conditions on his route, which he proceeded to ignore in violation of the regulations. So alerted he should have received the 3:17 p. m., special report from Phillipsburg, which would have warned of the lack of visibility at his area of destination. Or, being otherwise alerted, he could have called for this report at any time. Similarly, at 3:45 p. m., the same report was repeated, and earlier indications raised a duty to be alert to these reports. The exercise of a normal degree of care would have required the pilot to keep abreast of the weather changes as they occurred. He either failed to keep informed of the

rapidly deteriorating weather conditions, or he proceeded into the adverse weather and substandard visibility conditions. Either course of conduct would constitute a failure to exercise the high degree of care required.

When the pilot actually encountered bad weather somewhere along his route before reaching his intended destination, he chose to fly directly into it, in the knowledge of a weather front approaching from the west and in the knowledge of the mountainous terrain. It was established by defendant's admissions read into the evidence that there were alternate airports, Harrisburg, 80 miles southeast of the accident site, and Williamsport, 74 miles northeast of the accident site, at which the weather at 3:00 p. m. and 4:00 p. m. was well above the minimum visibility requirements. Harrisburg was approximately along the line of flight from Washington, D. C. to University Park, and the pilot had passed over this area shortly before arrival at University Park where he found the visibility obscured. It was established that when the pilot encounters weather ahead of him which makes it impossible to proceed under visual conditions, the proper course is to turn back into the prior condition of visibility from which he had just come. FAA Regulation 42–51–1 makes the pilot responsible for pre-flight briefing on alternate airports and the weather conditions at those places.

All of these matters show a disregard of the high standard of care required of the pilot under the circumstances. They establish a course of conduct the negligence of which was not seriously disputed. Defendant's expert testimony to counter this was largely speculative, and attempted to promote the idea that it is sometimes possible to ignore the weather warnings with impunity because the weather conditions may be variable from place to place, and a personal inspection may reveal that the flight may safely proceed. All of these courses fly directly in the face of regulations which impose a standard of conduct, and certainly indicate less than the standard of care required under the circumstances.

"A natural and probable consequence of not thus landing safely before flying into the overcast obviously was that the plane would crash. If the injury is a natural and probable consequence of the negligence, then that negligence is the proximate cause of the injury * * * Since a natural and probable consequence of not returning to the Allegheny County Airport or landing at some other airport in the vicinity while he could have done so safely was that the plane would crash, Prashker's negligence in not so landing was a proximate cause of the crash and its accompanying fatality." Weissman v. Prashker, 107 Pittsb.Leg. J. 299, 301 (1959).

■ Defendant argues that since the pilot is dead, there is a presumption that he exercised due care. But this presumption does not stand in the face of the specific and definite evidence that the deceased did not use due care. Newsome v. Baker, 395 Pa. 99, 148 A.2d 906 (1959); Johns v. Baltimore & O. R. R. Co., 143 F.Supp. 15 (W.D.Pa., 1956), affd. P.C. 239 F.2d 385 (3rd Cir., 1957). The defendant produced nothing to controvert the physical evidence in this case of a crash in level flight against the side of a mountain, which could not happen if the statutory standards were being observed. "Thus, the defendant here was called upon to show how, consistent with due care, his car sheared through a telephone pole and visited death upon the passenger in his charge." First National Bank of McKeesport v. Simko, 384 Pa. 603, 605, 122 A.2d 47, 48 (1956).

■ In conclusion we can see no other reasonable finding from the evidence but that the plane was flying below the minimum altitude prescribed by the regulations and that this violation of regulations was negligence as a matter of law. The regulations had for their purpose the protection of lives from a collision with an object in its path. The plane did collide with a mountain and the passengers

were killed. The violation of the regulation was a legal cause of the death. No testimony controverts the fact of the collision. There is no issue of credibility of this evidence. These are physical facts reported by disinterested witnesses, and are not established by opinion testimony. There is no presumption in favor of defendant that saves this issue for the jury.

We find this evidence to be identical to the type of evidence upon which the court granted summary judgment on liability in favor of plaintiff in American Airlines v. Ulen, 87 U.S.App.D.C. 307, 186 F.2d 529 (1949).

The plaintiffs' motion for judgment notwithstanding the verdict will be granted and the case assigned for inquisition of damages before a jury.