Lawrence R. WENZEL, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 6–65.

United States District Court
D. New Jersey.

Oct. 31, 1968.

Gelman & Gelman, by Carl Gelman, Paterson, N. J., Kreindler & Kreindler, by Milton G. Sincoff, New York City (N. Y.Bar), for plaintiff.

David M. Satz, Jr., U. S. Atty., Philip Silverman (D.C.Bar), Department of Justice, for the Government.

## OPINION IN LIEU OF FINDINGS AND CONCLUSIONS

WORTENDYKE, District Judge:

In this action Lawrence R. Wenzel, hereinafter plaintiff, suing under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), seeks damages for personal injuries and their consequences resulting from the crash of a Curtiss C–46F Cargo (Logair) Aircraft of which plaintiff was captain and pilot in the vicinity of

Thun Field, Puyallup, in the State of Washington, on February 16, 1963 at approximately 6:13 P.M., Pacific Standard Time. The case was tried by the Court without a jury over a period extending from April 2 to April 29, 1968. At the conclusion of the trial the Court reserved decision and permitted counsel for the respective parties to present summations and suggested findings of fact for the Court's consideration. The Court's findings of fact and conclusions of law will appear from this Opinion.

The complaint alleged, and the plaintiff at the pretrial conference contended, that the aircraft had departed from McChord Airforce Base, Washington, weighing, with its cargo, approximately 47,751 pounds. The crew of the aircraft consisted of Wenzel, as captain and his co-pilot, Miller. The Flight thus initiated was designated as 616Z, and its destination was Malstrom Airforce Base at Great Falls, Montana, a distance of 440 nautical miles from McChord. The weather at McChord at the time of take-off was VFR (permitting ground observation in flight), without clouds and with good visibility. The aircraft had two engines; that on the left is referred to as No. 1 and that on the right as No. 2. A separate control yoke and set of flight instruments was provided for each pilot, and the power control throttles were located upon a pedestal in the center of the cockpit between the pilot seats. On takeoff, Wenzel occupied the left seat and Miller the right seat, and Wenzel was flying the aircraft during the takeoff run and liftoff. At 0214:00 hours Greenwich Meridian Time, 6:13 P.M., Pacific Standard Time, there commenced a series of radio transmissions between the co-pilot of the aircraft and McChord Rapcon (Radar Approach Control). A transcription (Exhibit P–8 in evidence) of these communications, which were recorded as made on tape at the McChord Control, discloses that the aircraft reported, at 0214:15 to Rapcon that it was heading 120.1 and climbing

towards a 9000 foot altitude. By 0215:35 Rapcon reported the aircraft 4 miles east of McChord Airport, and at 0216.49 the aircraft reported that it was leaving 3000 feet altitude. It was then directed by Rapcon, at 0217:00, to report when leaving an altitude of 6000 feet. The latter report was transmitted by the aircraft at 0217:15, and at 0218:15 Rapcon reported that the aircraft was 10 miles east-northeast of McChord. At 0219:45 Rapcon directed the aircraft, which was then 13 miles east-northeast of McChord, to turn left, heading 050. At 0219:50 the aircraft requested permission to return to McChord, and Rapcon then directed the aircraft to continue in a left turn to a heading of 260, advising that this would give the aircraft a radar vector for a precision approach to Runway 16 at McChord and recommended that it maintain a 3000 foot altitude. The aircraft reported that it was then at 4000 feet and would descend to and maintain 3000 as directed by Rapcon. At 0220:29 Rapcon inquired of the aircraft as to the nature of its difficulty and was advised by the aircraft at 0220:35 that its left engine was feathered.[1] At 0221:07 Rapcon advised the aircraft that it was 12 miles northeast of McChord on a bearing of 260 descending to 3000 feet, and reported conditions of weather, visibility, dewpoint and winds at McChord. Thirty-one seconds later the aircraft reported that it had "a runaway prop", and twenty-one seconds thereafter McChord reported that the aircraft was 10 miles northeast of McChord. Shortly thereafter (at 0220:05) the aircraft reported "we've got it under control", but at 0222:20 the aircraft reported that the prop was going back into flat pitch again. At 0222:38 the aircraft was informed by Rapcon that it was then 9 miles northeast of McChord.

The following transmissions are relied upon by the plaintiff in this case to support his contention that the McChord Radar Controller, concededly a Govern-

[1]. Feathering means a procedure that turns the propeller blades to the streamlined position so that it has the least amount of drag.

ment employee, misinformed the aircraft and thereby induced the plaintiff to attempt to land the aircraft on a private airfield 15 miles from McChord and thereby caused the aircraft to crash after it had executed a misapproach to the airstrip and was making a "go round" for a new approach to the private field. Following Rapcon's advice at 0222:38 that the aircraft was 9 miles northeast of McChord under VFR conditions, Rapcon stated (at 0222:55) that the aircraft was "exactly five miles north of the runway at Thun Field". Thereupon the following succession of events occurred. The aircraft requested Rapcon to have the private airfield flash its landing lights. Rapcon undertook to telephone the request to the field but was unable to get the call through. In response to the aircraft's request for a radar vector, Rapcon directed that the aircraft "turn left heading 150 for Thun Field" and advised that the position of the aircraft was 4 miles north of Thun in a left turn to the heading given. At 0223:50 Rapcon volunteered the information to the aircraft that "the length of the runway is 5300", and at 0224:05 instructed the aircraft to turn right heading 155 when the aircraft was observed to be 3 miles north of the airport. At 0224:33 Rapcon reported that the aircraft was 1 mile north of the airport and possibly a little bit left of the runway. Moments later Rapcon advised that the elevation of the field was 520 feet. At 0225:00 the aircraft's communication to Rapcon was "High, we'll have to go around", and at 0225:07 Rapcon responded "Roger going around". At 0225:40 Rapcon reported the position of the aircraft as "one and half miles northeast of the runway at Thun Field", and at 0226:10 Rapcon advised that it had lost the aircraft on its Radar screen. The position of the wreckage of the aircraft and the pre-crash flight paths of the aircraft as disclosed by testimony of witnesses on the ground clearly indicate that it had successfully and safely executed its previous misapproach to the runway and was attempting to enter upon a new approach thereto from a point a mile and a half northeast of its northerly threshold and in doing so lost altitude in a sharp left turn, and struck a tree or trees, or the ground, with its left wing tip.

For what transpired in the cockpit of the aircraft between takeoff and crash we look to the testimony of the co-pilot Miller, which was taken by deposition, and to that of Wenzel who testified in person at the trial. Miller was also an employee of Zantop Air Transport, and its successor Universal Airlines, from August 9, 1962 until August 25, 1967, the date upon which his deposition was taken. On September 6, 1966 he had received his airline transport pilot's rating which qualified him to fly as captain of a C–46 aircraft. His total flight time was then approximately 5500 hours of which 2500 hours were in a C–46 aircraft. As of February 1963 he had a total flight time of 2000 hours of which between 200 and 400 hours were in a C–46 aircraft. He was co-pilot on Flight 60–16, Zantop's Logair 616Z, which crashed on February 16, 1963 near Thun Field. Miller had had previous experience with situations requiring the feathering of a propeller in a C–46 aircraft but had never experienced an overspeeding propeller commonly referred to as a "runaway prop". An effect of an overspeeding propeller is the production of excessive drag and consequently loss of altitude. In order to cope with an overspeeding propeller it is necessary to reduce the speed of the aircraft, which reduces the airflow, which keeps increasing the propeller's speed of rotation. In order to compensate for the increased drag created by the overspeeding left propeller it is necessary to apply some right rudder in order to maintain a straight course. The emergency checklist furnished by the manufacturer of the aircraft instructs that, in the case of a runaway propeller, the initial requirements are to feather the propeller and reduce the throttle to idle "cutoff". The same instructions advised that feathering is the first action to be taken if initiated prior to the approach of the RPM (revolutions per minute) to

overspeed range. If such range has been reached before the propeller can be feathered, the throttles should be closed, the nose pulled up to a minimum safe speed, and the attempt to feather the propeller resumed. Landing gear and flaps should be down, the aircraft should descend to minimum altitude and should be landed as soon as practicable. The FAA (Federal Aviation Agency) Regulations require that in an emergency created by a runaway prop the pilot should land the aircraft at the first available and suitable location. (Civil Aeronautical Regulations Part 42, Sec. 42.363). Table 3 of Section 42.80–1 of Title 14 of the Code of Federal Regulations prescribes aircraft landing limitations, and sub-table 2, relating to Curtiss C–46, certified for maximum weight of 4800 pounds, requires 3160 feet of *effective* length of runway for landing. *Actual* length of runway is the distance from the threshold at one end to the threshold at the opposite end. The *effective* length of a runway, however, is determined by taking the actual length and reducing it by a mathematical factor which is determined by the location and characteristics of obstacles in the glide path approach of the aircraft to the runway. The Thun Field runway extends in a northeast-southwest direction for a physical distance of 3040 feet. Its corrected length was 2667 feet. The glide angle for landing from the north upon the Thun Field runway was 4 to 1. Thun was located 6 miles east of Puyallup and 15 miles from McChord Airforce Base. It was stipulated between counsel during the trial that Airman's Guide Supplement, dated December 1, 1962, to the United States Aeronautical Information Publication issued by the Director of Airports and Seaplane Bases, was current on February 16, 1963. That publication disclosed that the longest hardtop runway at Thun was 3200 feet.

Miller testified that after a flight plan had been filed and takeoff clearance obtained at McChord, he, as co-pilot, switched the aircraft's radio to the Rapcon frequency and commenced performance of the usual duties of a co-pilot, which included handling communications between the aircraft and the Radar Approach Control at McChord. Just prior to making his transmission of 0219:50, in which he expressed desire to return to McChord, Captain Wenzel drew Miller's attention to the manifold pressure gauge for the left engine which then registered only 24 to 26 inches, when it should have been 35 to 36 inches. Miller then asked Wenzel if they were going back to McChord. Wenzel replied in the affirmative, and thereupon (0219:50) Miller made his transmission to Rapcon to that effect. At 0219:57 Rapcon directed the aircraft to continue its left turn to a heading of 260 which would be radar vector for a precision approach to runway 16 at McChord; but to Miller the left propeller then appeared to be functioning normally. When the left engine had appeared to be functioning abnormally because of the unaccountable loss of manifold pressure, the aircraft was at an altitude of between 4400 and 4600 feet. Wenzel was still flying the aircraft and when Rapcon inquired respecting the nature of the aircraft's difficulty Miller observed the Captain's right hand moving toward the feathering button for the left engine located on the control pedestal. Miller could not tell from his point of observation whether the engine did feather, but he nevertheless reported that the engine was feathered. He fixes the time when the propeller began to run away as between 0220:35 and 0221:07, when the Captain directed him to hold the aircraft while he endeavored to make the governor take control of the propeller again. Miller thereupon took over the piloting by handling the controls, applying right rudder and continuing to make transmissions to Rapcon. At 0222:05 Miller reported to Rapcon that they had the propeller under control and at that time, although the aircraft had lost some altitude, it was still above 3000 feet. At 0222:20 Miller advised Rapcon that the propeller was going back into flat pitch again, but Miller did

not recall whether he or the Captain was flying the aircraft at that moment. However the Captain again took over the flight of the aircraft and made the decision to return to McChord which was the first available suitable airport at which the regulations required the aircraft to land. Accordingly the aircraft headed for McChord.

Miller recalled that the difficulty with the left engine and propeller had occurred more than twice before Captain Wenzel decided to go to Thun Field. When Rapcon advised, at 0224:05, that the aircraft was 3 miles north of that field the ground speed of the aircraft was approximately 120 knots (138 MPH). Captain Wenzel was flying the aircraft and its altitude was decreasing as it came in for a landing approach. Miller observed the beacon at Thun and so advised Rapcon. At 0224:33 Rapcon reported to the aircraft that it was a mile north of Thun, slightly to the left of the runway. The landing gear was then down; and at 0225:00 the aircraft was at the threshold of the runway at an elevation of 50 feet, in a landing attitude. Miller then advised Rapcon that the aircraft was "high" and they would have to go round.

Miller says that about the time they reached the threshold of the Thun Field runway, it was obvious that there was something wrong, i. e., that if the aircraft continued the approach, it would have gone beyond the end of the runway. Accordingly it appeared to Miller that they did not have enough runway to permit them to touch down because they would have been unable to stop the aircraft within the length of the runway. Although Miller had the Thun Field in sight, he was unable to see any of the surrounding trees or overruns during the approach.

When the aircraft was about 50 feet above the surface of Thun Field and well lined up with the center of the runway, Wenzel turned the aircraft to the left, and as Miller looked down he observed fir trees from 80 to 120 or 130 feet in height. He testified that this observation was immediately before the aircraft crashed, but he conceded that the aircraft had climbed from the point at which it was 50 feet above the surface of Thun Field to the elevation at which Miller was able to look out of the cockpit window and observe the fir trees below. From the aircraft's announcement that it was "going around" (at 0225:00) until its disappearance from the Rapcon radar screen (at 0226:10) a time interval of one minute and ten seconds elapsed, during which the aircraft had turned off from its landing approach and climbed to a point one and a half miles northeast of the runway.

In consequence of the long period of unconsciousness which he suffered following the crash plaintiff was unable to recall any of the events immediately preceding the crash of the aircraft which he was piloting. He did remember looking out of the left window of the cockpit from his position in the left pilot seat, and observing a short intense flame on the inboard side of the left engine. He remembered seeing the tachometer going up from 1700 RPM to 3300 RPM, which to him indicated an overspeed condition of the left engine or a runaway propeller. He also recalls experiencing a severely intense vibration of the aircraft, and that he had pressed the left feathering button with both thumbs hard. For operation of the feathering button the pressure of one thumb is normally adequate. He could not relate his efforts to press the feathering button to any other event in point of time, but he did recall observing "the horizon made up of the trees, darker trees, outlined against a not-quite-so-dark sky. This horizon moved jerkily past the co-pilot's windshield", from left to right from his position. The Captain testified that the airplane was then in a straight and level attitude but was moving from left to right which in his opinion would mean that the aircraft must have been rotating counter-clockwise. He explained that "it would be the same way the aircraft would rotate if the left wing hit a tree and the left wing remained station-

ary and the right wing continued in a circle." He concluded from that observation that he was in no bank at the time it was made, but that the aircraft was yawing at the time. He was unable to recall for how long prior to the time when he made the observation he had been in level flight but concluded from the apparent jerky movement of the horizon during the yaw of 20 or 30 degrees that he "must have hit something when * * * [he]observed this to cause the jerking. It would not be jerking in the normal flight if the airplane did not hit an obstacle. It would be a smooth movement if we were airborne."

A survey sketch of Thun Field and the immediate vicinity, with the reconstructed flight path of the aircraft in approaching and executing its attempted misapproach to the runway superimposed thereon; a wreckage-distribution chart showing the respective locations of scattered portions of the aircraft; photographs of the wreckage and of the neighboring terrain in various directions and at various elevations; the plotted course of the aircraft from the commencement of its initial approach to the runway until it crashed from an altitude of 200 feet at a point a mile and a half northeast of the northerly threshold of the runway, have enabled the Court to reconstruct some of the events which transpired during the relevant period. Thun Field is located in a fairly level, spottily tree-covered terrain in open country generally unoccupied by buildings in excess of two stories in height. The field itself consists of a single runway extending in a northeasterly-southwesterly direction with a 40-foot-wide bituminous paved landing strip 3040 feet in actual length and an apron, hangars and related office structures along the westerly side of the field. To the north of the threshold are two trees 60 and 62 feet in height, and to the east a low tree-covered ridge which roughly parallels the landing strip and is separated therefrom by grass-covered, generally level terrain in excess of 50 feet in width. At the southerly end of the strip the ground surface drops abruptly from the level of the southerly overrun of the runway to a depth of 100 feet below. Over this declivity an airborne plane could continue in prolongation of the line of its flight longitudinally over the landing strip and the southerly overrun for an unobstructed distance to the south. An aircraft traveling longitudinally over the center line of the paved portion of the runway at an altitude of 50 feet above its surface could continue in a straight line at the same or at a gradually increasing altitude before changing direction for the purpose of executing a go-round to make a new approach to the northerly overrun of the runway. It appears obvious, however, from the evidence that the aircraft involved in this case, upon reaching a point midway of the length of the paved runway of the air strip, and while still maintaining an altitude of 50 feet or less above the same, executed a left turn of approximately 90 degrees into a northeasterly direction, climbed to an altitude of 200 feet, and while attempting to make another left turn through a similar arc, struck a tree or trees with its left wing and crashed in an open level area a mile and a half to the northeast of the northerly threshold of the airstrip.

It is conceded by the Government that McChord Rapcon, an agency of the defendant, misstated or inadequately disclosed to the plaintiff the characteristics and limitations of Thun Field for the landing thereon of the C–46 of which the plaintiff was in command. However the evidence is uncontradicted that the unsuitability of the airfield became or must have become obvious and apparent to the plaintiff before his aircraft had travelled over the actual length of the paved portion of the airstrip, and before it had made a touchdown thereon, and while it was maintaining sufficient flying speed to permit it to achieve adequate altitude to resume its flight to McChord 15 miles away, or to attempt to make a new approach to Thun Field from a sufficient

altitude and distance above and to the north of its northerly threshold. The evidence fails to disclose the reason why the aircraft made its initial left turn off of the Thun airstrip, or what caused it to crash after it had successfully made the misapproach, had regained substantial altitude and travelled a distance of a mile and a half from the airfield where it crashed in the course of its second turn. Assuming that the McChord control misinformed the plaintiff respecting the availability or suitability of Thun Field as a place to set down the aircraft, I find no evidence that such misinformation was a proximate cause of the injuries of which complaint is made.

Plaintiff argues that a precedent for recovery of damages here is to be found in Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2 Cir. 1967) cert. den. United States v. Ingham, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292. However, I find the two cases distinguishable factually. In Ingham Eastern's passenger airliner crashed at Kennedy International Airport while attempting to land on a runway which was engulfed in swirling ground fog. The liability asserted against Eastern by the plaintiff passenger was predicated upon the pilot's alleged failure to exercise due care in operating the aircraft and that this negligence was one of the causes of the collision. The Government was joined as a defendant under the Federal Tort Claims Act "on the claim that poor visibility was a factor in the crash and that a substantial contributing and concurrent cause of the accident was the negligence of the Air Traffic Controllers and the United States Weather Bureau Observer in failing to provide adequate and up-to-date weather information." Eastern's negligence was found to consist in its execution of a "misapproach maneuver" in a negligent manner. The Government's liability was predicated upon the Controller's failure to report the change in visibility in the landing area from one mile to three quarters of a mile which was at variance with the provisions of § 265.2 of the Air Traffic

Control Procedures Manual of the FAA. In Ingham the Government argued that the failure of its Controller to comply with § 265.2 of the Manual was not the proximate cause of the accident. With this contention the Court of Appeals disagreed and held that in the circumstances of the case the failure of the Controller to inform the aircraft that visibility had dropped to three quarters of a mile, only slightly above the aircraft's minimum, was a proximate and concurrent cause of the accident. Moreover, in Ingham it was pointed out that if the crew of the aircraft had been notified of the changing weather conditions, the pilot might have decided to divert to another airport rather than to attempt an ILS landing at the airport in question, or the crew might have maneuvered the plane differently and could have been ready and able at an earlier time to execute a missed approach. In the case at bar it should be recalled that the facilities at McChord had been alerted for the return of the aircraft to that Base, and the plaintiff had decided to proceed accordingly. Rapcon's information that Thun Field was in the vicinity, even though it overstated the length of that field's runway, left to the plaintiff the choice of deciding between the two airports, despite the obviousness of the greater element of safety in choosing to return to McChord.

As was stated in United States v. Schultetus, 277 F.2d 322, at p. 325, 86 A.L.R.2d 375 (5 Cir. 1960):

"Liability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care. * * *. The applicable law, under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), is that of Texas. The well-settled negligence rule in Texas is that 'The ability to have foreseen and prevented the harm is determinative of responsibility.' * * * But, * * * '* * * it is not required that the particular accident complained of should have been foreseen. All that is required is "that the injury be of such a general char-

acter as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.'"

If, as plaintiff here contends, Mc-Chord Rapcon was negligent in misstating the length of the Thun Field runway, such misstatement would not establish legal liability on the part of the defendant. Such liability could only be found if the negligence complained of was a proximate cause of the injuries, i. e., "a cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which it would not have occurred." Wenninger v. United States, 234 F.Supp. 499 (D.C.Del.1964) aff'd 352 F.2d 523 (3 Cir. 1965); 38 Am.Jur., Negligence, § 50, p. 695.

The first intimation received by the McChord Rapcon was a communication from the aircraft at 0219:50 that it desired to return to McChord from which it had so recently taken off. Rapcon thereupon directed the aircraft to continue its left turn heading 260 which would be the radar vector for a precision approach to runway 16 at McChord and to maintain 3000 altitude. At 0220:29 Rapcon inquired respecting the aircraft's difficulty and was informed that its left engine had been feathered. The aircraft reported at 0222:05 "we've got it under control" but fourteen seconds later reported "its going back into flat pitch again". Upon ascertaining that the aircraft, then 9 miles northeast of McChord, was flying in VFR conditions Rapcon informed the aircraft that it was exactly 5 miles north of the runway at Thun Field and in compliance with the request from the aircraft was given a radar vector for Thun. At 0223:50 Rapcon volunteered the information that the length of the Thun runway was 5300 feet and to turn right heading 151 when the aircraft was 3 miles north of Thun. Thereupon plaintiff apparently determined to attempt to land the aircraft at Thun but upon as-

certaining by visual inspection that the runway there was of insufficient length to land the aircraft and that his approach to the runway was at too high an altitude to put down the aircraft successfully, executed a misapproach by turning to the left in a climbing turn, cleared the tops of a row or clump of trees to the east of the runway and after flying in a northeasterly direction was suddenly confronted with a repetition of a runaway left propeller, lost altitude and crashed apparently in the course of executing another left turn. The continuity of the chain of alleged causation between Rapcon's misinformation respecting the length of the runway and the crash of the aircraft was broken by a series of events in no way chargeable to that misinformation. The first intervening event was the discovery by the plaintiff before the aircraft had traversed its actual length that the runway was too short to permit the actual landing of the aircraft thereon. Having discovered this situation plaintiff decided to go around and indeed was successful in changing the aircraft's course by at least 90 degrees and in climbing over the obstruction created by trees on the new course by about 20 feet to spare. Whatever inconvenience may have resulted from the misinformation regarding the length of the runway inflicted no damage upon the plaintiff whose flying skill enabled him to avoid a collision with the trees over which he had safely passed. There was no evidence that upon the completion of this maneuver of avoidance the course of the aircraft's flight was out of the control of its pilot. Indeed after clearing the trees the aircraft completed the reversal of its course and proceeded to gain altitude over a distance of a mile and a half. At the end of that distance for some reason and in some manner the course of the aircraft again turned sharply to the left and crashed. Whether the immediate cause of the crash was another runaway propeller or an explosion or too steep a banking turn too near the ground with wingtip contact with a ground obstruc-

tion is neither disclosed by nor to be inferred from the evidence in the case. From 0224:33 when Rapcon observed that the aircraft was a mile north of Thun Airport until its position at one and one half mile northeast of the runway was observed on the radar screen Rapcon did nothing to control or influence the handling of the aircraft which was in the exclusive control and the primary responsibility of the plaintiff as pilot. Somlo v. United States, 274 F. Supp. 827 (D.C.Ill.1967) and cases cited.

The single independent eye witness whose testimony discloses the succession of events commencing with the aircraft's approach to Thun Field and its radical change in direction from a mid-point over the length of the paved airstrip, through an angle of 90 to 110 degrees, to a flight path extending to a point a mile or a mile and a half to the northeast of the northerly threshold of the field, was Carl J. Thun, the son of the owner of the field and the holder of an aircraft pilot's license with 300 hours of flying time as of February 13, 1963 and 700 hours as of August 29, 1966 when he testified. The substance of his testimony was as follows: On February 16, 1963, just before dark in the evening, as he was standing on the ground in the vicinity of the field office on the westerly side of the paved airstrip he heard the sound of an airplane propeller running wild; but paid little attention to the sound until he heard it a second time three minutes later. He then observed an airplane coming in from the north about half a mile from the northerly end of the runway, which appeared to be coming in for a landing at a speed of approximately 115 miles per hour in a descending attitude from an altitude of 200 feet. The pilot of the aircraft appeared to be "lining himself up for the runway" and had descended to an altitude of about 20 feet above the northerly end of the runway. The pilot then suddenly increased his engine power and turned left apparently for the purpose of making a go-round. The left turn was made after the aircraft had trav-ersed a distance of 200 feet over and above the center line of the paved portion of the runway. In making its turn, the aircraft changed direction from a southerly into an easterly course, passed over a line or clump of trees to the east of the runway with a clearance of about 20 feet and continued in a left hand turn into a northeasterly direction beyond the trees. When the aircraft had reached a point "half way round the turn" the witness again heard the sound of a runaway propeller. When the aircraft began its go round from the point over the airstrip it commenced a climb, and it was during the climbing turn that the propeller went wild again, the aircraft hit a tree on the ground and exploded, shooting flames 500 to 1000 feet in the sky. Having characterized the movements of the aircraft during the go round as erratic, the witness explained that "usually you don't do that on a go round. * * To pull off short of the runway like that and go round * * *. Instead you go straight over, you know, instead of taking a straight course over the runway and gaining altitude, which is usually the procedure, well, he took and cut to the left over the trees, and it is erratic right there, in cutting over the trees." The witness identified the aircraft as a C–46 and testified that it had both its navigation lights as well as its landing lights on. The testimony of the same witness indicated that the paved portion of the runway was 3400 feet with a 1200 foot overrun at the north end and an 800 foot overrun at the south end and a width of 50 to 60 feet. There were trees to the north of the field and on its easterly side approximately 30 or 40 feet in height. The southerly overrun of the runway terminated in a drop off of 200 feet. The witness did not observe the position of the landing gear of the aircraft during the events to which he testified. Several air photographs taken of Thun Field and neighboring areas, including the fragments of the aircraft in the locations in which they were found after the crash were identified and explained by the witness.

A competent expert pilot familiar with the C–46 aircraft expressed the opinion that the conduct of the plaintiff in handling this aircraft in the vicinity of Thun Field constituted "very poor technique". The foregoing opinion is to be found in the direct testimony of Edward A. Cabler at page 1082 of the transcript evoked by the following hypothetical question:

"I want you to assume that in the C–46 weighing forty-seven thousand pounds with the left engine inoperative, the pilot executes a missed approach and in the following manner: That after reaching an altitude of approximately twenty to twenty-five feet at a distance of two hundred feet past the beginning of the hard surface of a runway, the aircraft continues at the altitude of twenty to twenty-five feet for a distance of approximately an additional fourteen or fifteen hundred feet, and thereafter the aircraft before reaching the end of the hard surface of the runway executed a climbing turn to the left at an angle of bank ranging from thirty to forty degrees, * * *."

The witness responded (p. 1083):

"I would say it's a very poor technique"; explaining that

"the runway is clear and has approaches on each end. The sides are not particularly clear. This is an obstruction zone halfway down. I would say on most any of them, or an unknown area that you wouldn't want to go into a steep turn on any missed approach procedure which is to be avoided, particularly on a single engine."

"The other thing is, in a steep bank, you increase the stalling speed, and the resulted loss in lift at a very critical time, close to the ground, and this is not a good procedure at all."

At page 1085, the Court put a further hypothesis to the witness:

"Assuming that he made that turn from an approximately wing-level position over the center line of the landing strip and that he accomplished it successfully without wing contact with any obstruction, and he reversed his original direction, in other words, instead of traveling south, he ultimately got into a northerly direction or approximately so; assume also that the left engine was still inoperative and he eventually achieved an elevation on this last leg of this course—of * * [two hundred feet above the terrain] * * * in changing direction at that point again to the left to reapproach the threshold of the landing strip, would he go through similar operations to those which you described?"

To which the witness answered in the affirmative stating that he would:

"* * * apply maximum power to the good engine" put the flaps up, rotate the aircraft so that it starts into a climbing altitude to establish—V2 speed [93 knots] and then [call] for "gear up, hold the aircraft straight ahead with the good engine down three or so degrees, just a little slight drop, and the rudder, if you have got it trimmed up, you would want to take some of the rudder trim out so that it didn't push your side of your fuselage into the slipstream too far. * * * Now * * * hold this for preferably to an altitude of approximately two hundred feet straight ahead at just like we are going; and then at two hundred feet, you can ease the nose down a little, accelerate to a better climb speed, and reduce the power to meto, maximum except takeoff.

You bring the power back and the throttles—I mean the propeller control back and now you would be going approximately as good as you could do it. You would continue this until four hundred feet, or you should do this if you possibly get to four hundred feet which is kind of an accepted circling, four to five hundred feet. You would be fairly out of all the trees, and then you could make an approach again to the airport that you just left, maintaining shallow banks as you come around the pattern."

I find from the evidence that on February 16, 1963 in the early evening the plaintiff Wenzel approached the landing strip at Thun Field, Washington, descended to an altitude of 20 to 25 feet above the center of the runway, flew over that center line longitudinally for a distance of approximately 200 feet and then executed a steep banking turn to the left through an arc of 90 to 100 degrees, climbed over a line or clump of trees to the east of the runway, continued in his banking turn to the left, travelled a distance of a mile and a half northeasterly and there either collided with a tree or with the ground and exploded. The weather was clear at the time of the approach to the runway; the plane's landing lights were lighted and the only reasonable explanation for the pilot's attempted go-round was his intention to make a misapproach to the airstrip for landing. Had the pilot pursued his straight course longitudinally over the center line of the paved portion of the landing strip and continued on over the dropoff at the southerly end of the overrun and gradually gained altitude before banking and changing his direction, he could either have returned to McChord Airforce Base, where facilities were available for his safe landing, or he could have attempted a reapproach after go-round to the Thun Field Airstrip at a lower speed than that at which his initial approach was made. If the last runaway prop episode which occurred a mile or a mile and a half to the northeast of the northerly threshold or a banked turn at too low an altitude was responsible for the explosion and/or crash, it cannot reasonably be inferred that the misinformation given to the pilot by the McChord Rapcon was a proximate cause of the injuries of which the plaintiff complains.

Another ground witness, Carlson, the proprietor of a garden supply nursery in Puyallup, about 4 or 5 miles northeast of Thun Field, was standing at his place of business and observed the aircraft before it changed its flight direction from westerly to southerly. This witness had been a military aircraft pilot but had never flown a C–46. His attention was initially attracted by the sound of a "runaway prop" when the aircraft was at an altitude of 4000 or 5000 feet and headed in a westerly direction. The witness observed that one of the propellers of the aircraft was "feathered" and noted what he recognized as the resultant reduction in the speed of the aircraft. He followed its flight path with his eyes for a "couple or three minutes" while it continued on its westerly heading and maintained the same altitude. The aircraft then made a medium bank (30 degrees), turned into a southerly direction and disappeared from the witness's view behind an intervening hill. What he characterized as a second "high-pitched" noise from the aircraft attracted his attention just prior to the commencement of its left turn, and he described that "noise" as "an increase of R.P.M." as if in an attempt to increase power to regain lost altitude. Carlson affords no disclosure of any events which occurred after the aircraft commenced its approach to the runway at Thun Field.

■■■ With respect to the Government's affirmative defense that the plaintiff contributed by his own negligence in the causation of the crash of the aircraft the burden of proof to support that defense rests upon the Government. Because of the absence of evidence respecting the events which transpired in the execution of the aircraft's go-round I am unable to reach a conclusion as to the cause of the crash of the aircraft or any acts or omissions on the part of the plaintiff which may have contributed thereto. Speculation may not serve in lieu of evidence to support a finding either of negligence or contributory negligence. While we have evidence of the communications between Rapcon and the aircraft up to the point at which the aircraft was a mile to the north of the threshold of the Thun runway, and that the aircraft changed its direction without touching down upon the runway and was able to climb over the trees to the east of the runway, the

events which transpired thereafter and their interrelationship afford only a basis for speculation as distinguished from reasonable inference.

I conclude that this Court has jurisdiction of the cause of action alleged in the complaint and that the defendant, through its agent and employee, the Rapcon Controller at McChord Airforce Base, failed to exercise reasonable care in the information which it furnished to the plaintiff and his co-pilot respecting the length of the Thun Field runway. However the evidence is insufficient to sustain the plaintiff's burden of proving that the negligence imputable to the defendant was a proximate or concurring cause of the crash of the aircraft on February 13, 1963. The defendant therefore is entitled to judgment in this action and an Order in conformity with this Opinion may be presented.